STAFFORD ET AL., COPARTNERS, DOING BUSINESS AS STAFFORD BROTHERS, ET AL. *v.* WALLACE, SECRETARY OF AGRICULTURE, ET AL.

·BURTON ET AL. *v.* CLYNE, UNITED STATES DISTRICT ATTORNEY FOR THE NORTHERN DISTRICT OF ILLINOIS.

APPEALS FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

Nos. 687, 691.  Argued March 20, 21, 1922.—Decided May 1, 1922.

1. Under the Packers and Stockyards Act of 1921, c. 64, § 316, 42 Stat. 159, an order of the District Court refusing a temporary injunction in a suit to enjoin the enforcement of orders made under the act by the Secretary of Agriculture, is appealable directly to this court.  P. 512.

2. It is for Congress to decide from its general information and from the special evidence brought before it, the nature of evils, present or threatening, and to enact such legislation within its power as it deems necessary to remedy them; and this environment should be, considered by the courts in interpreting the scope and effect of the act in order to determine its validity.  P. 513.

3. Commerce among the States is not a technical legal conception but a practical one, drawn from the course of business.  P. 518.  *Swift & Co.* v. *United States,* 196 U. S. 375.

4. Streams of commerce among the States are under the national protection and regulation, including subordinate activities and facilities which are essential to such movements though not of interstate character when viewed apart from them.  P. 519.

5. Such a current of interstate commerce is found in the uninterrupted movement of livestock from the West and Southwest into the great stockyards at Chicago and elsewhere, where it is sold by the consignee commission merchants to packers and livestock dealers at the stockyards, and in the movement thence into other States of the meat and other products of the animals slaughtered at the packing establishments and the live animals which are resold at the yards by the dealers for further feeding and fattening. P. 514.

6. The commission merchants who receive the livestock as consignees of the shippers and sell it to the packers and dealers at the stockyards, and the dealers in reselling there to stock farmers and feeders, are essential factors in this interstate movement; their sales, though local transactions in that they create a local change of title, do not interrupt the current but, on the contrary, are indispensable to its continuity. P. 516.

7. For the purpose of protecting this interstate commerce from the power of the packers to fix arbitrary prices for livestock and meat, through their monopoly, aided, as was thought, by their control of stockyards, and from exorbitant charges, duplication of commissions, and other deceptive practices in respect of prices, in the passage of livestock through the stockyards, made possible by collusion between the stockyards management and the commission men, on the one hand, and the packers and dealers on the other, Congress, in connection with regulation of the packers, had power to regulate business done in the stockyards. P. 514.

8. A reasonable fear upon the part of Congress that acts, usually lawful and affecting only intrastate commerce when occurring alone, will probably and more or less constantly be performed in aid of conspiracies against interstate commerce or constitute a direct and undue burden upon it, serves to bring such acts within the current of interstate commerce for federal restraint. P. 520.

9. It is primarily for Congress to consider and decide the danger of such acts or practices, and to meet it, and it is not for this court to substitute its judgment in such a matter unless the relation of the subject to interstate commerce and its effect upon it are clearly nonexistent. P. 521.

10. The Packers and Stockyards Act of 1921, which seeks to regulate the business of the packers done in interstate commerce and incidentally provides for supervision and control of facilities furnished in stockyards in connection with the receipt, purchase and sale of livestock and its care, shipment, weighing or handling in interstate commerce, requiring commission men and dealers as well as stockyard owners to register with the Secretary of Agriculture, and prescribing that all rates and charges for services and facilities in the yards and all practices concerning the livestock passing through them shall be just, reasonable, nondiscriminatory and nondeceptive, and that a schedule of such charges be kept open for public inspection, only to be changed upon notice to the Secretary of Agriculture, and empowering him to inquire into and regulate such charges and practices, to prescribe the forms of accounts and make rules and regulations for the enforcement of the act, etc.—is

not objectionable from the standpoint of the commission men and dealers upon the ground that their business is merely intrastate, but is within the power of Congress under the Commerce Clause. P. 513.

Affirmed.

THESE cases involve the constitutionality of the " Packers and Stockyards Act, 1921," approved August 15, 1921, c. 64, 42 Stat. 159, so far as that act provides for the supervision by federal authority of the business of the commission men and of the live-stock dealers in the great stockyards of the country. They are appeals from the orders of the District Court for the Northern District of Illinois refusing to grant interlocutory injunctions as prayed. The bills sought to restrain enforcement of orders of the Secretary of Agriculture in carrying out the act, directed against the appellants in No. 687, as the commission men in the Union Stockyards of Chicago, and against the appellants in No. 691, as dealers in the same yards. The ground upon which the prayers for relief are based is that the Secretary's orders are void, because made under an act invalid as to each class of appellants. The bill in No. 687 makes defendants the Secretary of Agriculture and the United States Attorney for the Northern District of Illinois, averring that the latter is charged with the duty of enforcing the severe penalties imposed by the act for failure to comply with orders of the Secretary thereunder. The bill in No. 691 makes the United States Attorney the only defendant, with the same averment.

The two bills in substance allege that the Union Stock Yards & Transit Company was incorporated by the State of Illinois in 1865, and given authority to acquire, construct and maintain enclosures, structures and railway lines for the reception, safekeeping, feeding, watering and for weighing, delivery and transfer of cattle and live stock of every description, and to carry on a public live-stock

market with all the necessary appurtenances and facilities; that it is the largest stockyards in the world, and in 1920 handled fifteen million head of live stock of all descriptions, including cattle, calves, hogs and sheep, shipped mainly from outside the State of Illinois; that the live stock are loaded at the point of origin and shipped under a shipping contract which is a straight bill of lading consigning them to the commission merchants at the yard, that on arrival the live stock are at once driven from the cars by the commission merchant, who is the consignee, to the pens assigned by the stockyards company to such merchant for his use, that they are then in the exclusive possession of the commission merchant, are watered and fed by the stockyards company at his request, that with the delivery to the commission merchant, the transportation is completely ended, that all the live stock consigned to commission merchants are sold by them for a commission or brokerage, and not on their own account, that they are sold at the stockyards and nowhere else; that the commissions are fixed at an established rate per head, that the commission men remit to the owners and shippers the proceeds of sale, less their commission and the freight and yard charges paid by them; that the live stock are sold (1) to purchasers who buy the same for slaughter at packing houses, located at the stockyards or adjacent thereto; (2) to purchasers who buy to ship to packing houses outside the State of Illinois for slaughter; (3) to purchasers who buy to feed and fatten the same; and (4) to dealers or traders; that about one-third of all the live stock received are sold to the dealers; that not until after the delivery of the live stock to the commission merchants and the transportation has completely ceased, does the business of the dealers begin; that they do not buy or sell on commission, but buy and sell for cash exclusively for their own profit, that the greater part of live stock received by commission men at

the yards are in carload or trainload lots and a substantial part are not graded or conditioned to meet the specific requirements of the buyers, that the dealers after purchase put the live stock in pens assigned to them by the stockyards owner and do the sorting and classification, that the dealers buy in open market in competition with each other, that they pay the expense of the custody, care and feeding and watering the stock while they hold them, that they sell promptly and have nothing to do with the shipment of the live stock they sell from the yards to points outside.

In the bill in No. 691, the appellants aver that they are members of the Chicago Live Stock Exchange and of the National Live Stock Exchange, the members of which are dealers in all the stockyards of the country numbering 2,000, and that they bring their bill for all of them who may choose to join and take the benefit of the litigation.

The chairman of the Committee of Agriculture in reporting to the House of Representatives the bill, which became the act here in question (May 18, 1921, 67th Cong., 1st sess., Report No. 77, to accompany H. R. 6320), referred to the testimony printed in the House Committee Hearings of the 66th Congress, 2nd session, Committee on Agriculture, vol. 220–2 and 220–3, as furnishing the contemporaneous history and information of the evils to be remedied upon which the bill was framed.

It appeared from the data before the Committee that for more than two decades it had been charged that the five great packing establishments of Swift, Armour, Cudahy, Wilson and Morris, called the "Big Five", were engaged in a conspiracy in violation of the Anti-Trust Law, to control the business of the purchase of the live stock, their preparation for use in meat products, and the distribution and sale thereof in this country and abroad. In 1903, a bill in equity was filed by the United States to enjoin further conduct of this alleged conspiracy, as a

violation of the Anti-Trust Law, and an injunction issued. *United States* v. *Swift & Co.*, 122 Fed. 529. The case was taken on appeal to this court, which sustained the injunction. *Swift & Co.* v. *United States*, 196 U. S. 375. In 1912, these same defendants or their successors in business were indicted and tried for such violation of the Anti-Trust Law, and acquitted. (See House Committee Hearings before Committee on Agriculture, 1920, vol. 220-2. Subject, Meat Packer Legislation, p. 718.) It further appeared that on February 7, 1917, the President directed the Federal Trade Commission to investigate and report the facts relating to this industry and kindred subjects. The Commission reported that the "Big Five" packing firms had complete control of the trade from the producer to the consumer, had eliminated competition, and that one of the essential means by which this was made possible was their ownership of a controlling part of the stock in the stockyards companies of the country. The Commission stated its conclusions as follows:

"The big packers' control of these markets is much greater than these statistics indicate. In the first place, they are the largest and in some cases practically the only buyers at these various markets and as such hold a whip hand over the commission men who act as the intermediaries in the sale of live stock.

"The packers' power is increased by the fact that they control all the facilities through which live stock is sold to themselves. Control of stockyards comprehends control of live stock exchange buildings where commission men have their offices; control of assignment of pens to commission men; control of banks and cattle-loan companies; control of terminal and switching facilities; control of yardage services and charges; control of weighing facilities; control of the disposition of dead animals and other profitable yard monopolies; and in most cases control of all packing house and other business sites. Packer owned

stockyards give these interests access to records containing confidential shipping information which is used to the disadvantage of shippers who have attempted to forward their live stock to a second market." Summary of Report of the Federal Trade Commission on Meat Packing Industry, July 3, 1918.

Following the report of the Federal Trade Commission, and before the passage of this act, a bill in equity for injunction was filed in 1920, in the Supreme Court of the District of Columbia, in which, on February 27th of that year, was entered a decree against the same "Big Five" packers consented to by them, with the saving clause that it should not be considered as an admission that they had been guilty of violations of law. The decree enjoined the packers from doing many acts in pursuance of a combination to monopolize the purchase and control the price of live stock, and the sale and distribution of meat products and of many by-products in preparation of meats and in unrelated lines, not here relevant, and from continuing to own or control, directly or indirectly, any interest in any public stockyard market company in the United States, or in any stockyard market journal, or in any stockyard terminal railroad or in any public cold storage warehouse. (House Committee Hearings, Committee on Agriculture, 1920, vol. 220–2, p. 720, " Meat Packer Legislation.")

It appears from these committee hearings that the dealers do not buy fat cattle generally or largely compete with packers in such purchases. They buy either the thin cattle known as " stockers and feeders ", which they dispose of to farmers and stockfeeders, to be taken to the country for farm use and fattening, or they buy mixed lots and cull out of them the fat cattle. These they dispose of to packers either directly or through commission men. The proportion of all the hogs passing through the yards in 1919 handled by these traders, speculators or scalpers, as they are indifferently called, was 30 per cent. Of all

the butcher cattle they handled 20 per cent., of the beef cattle 10 per cent., and of the "stockers and feeders" 80 per cent. At Kansas City, this last figure was higher, reaching 95 per cent. (Committee Hearings, p. 2140.)

It was conceded that of all the live stock coming into the Chicago stockyards and going out, only a small percentage, less than 10 per cent., is shipped from or to Illinois.

The complaints of the shippers of live stock against the charges and practices, working to their prejudice, in the conduct of the stockyards, the commission men and the dealers, were: First, suppression of competition in purchases through agreement by which one packer would buy a car load or train load of cattle and turn over half of it to the only other packer buying in the local market. Second, "wiring on." A shipper would send a car load or train load of stock to one stockyard. Finding the market unsatisfactory, he would ship them further east. The packers' agents were promptly advised at the second stockyards and, controlling the price there, they made it the same as at the first stockyards, though the shipper had paid the freight and had to stand the "shrink" of the cattle from the journey. Third, the charges in the stockyards for hay and other facilities were excessive. Fourth, the duplication of commissions through the collusion of the commission men and the dealers, by which commission men would sell at a lower price to dealers than to outside buyers and drive the latter to buying from dealers through commission men, forcing two commissions. Fifth, the monopoly conferred by the stockyards owner on a company in which packers were largely interested, of buying at a fixed price of $5.00 a head all dead cattle for rendering purposes, when they were worth more. Sixth, the frequency with which commission men reported to shippers that live stock had been crippled and had to be sold in that condition at a lower price, arousing suspicion as to the fact

and if it was a fact, as to the cause of the crippling. (Pages 22, 23, 24, also 466, *et seq.*, 1086; 2125, 2244, *et seq.* Committee of House Hearings—Committee on Agriculture, vols. 220–2 and 220–3, 66th Cong., 2nd sess.)

*Mr. Elwood G. Godman,* with whom *Mr. Edwin W. Sims, Mr. Albert G. Welch* and *Mr. Frederic R. De Young* were on the brief, for appellants, in No. 687.

The individual appellants are not engaged in interstate commerce. *Hopkins* v. *United States,* 171 U. S. 578; *Blumenstock Bros. Advertising Agency* v. *Curtis Publishing Co.,* 252 U. S. 436.

The performance of the service of buying or selling livestock for the account of others in an open, public, competitive, market, upon a fixed per-head or per-car charge for such service, cannot be said to be a transaction in interstate commerce but is a thing separate and distinct. The character of service rendered, or the commission charged, is in no way affected by the origin of the shipment, whether within or without the State of Illinois. When the livestock reaches the possession of appellants the transportation has ceased, and it does not begin again, if ever, until after the services of appellants have been fully performed and their possession parted with.

The business of appellants is as distinctly separate from interstate commerce in livestock as is that of a broker who negotiates sales of merchandise between parties resident in different States but who has no control over the shipment of the commodities dealt in. *Ficklen* v. *Shelby County Taxing District,* 145 U. S. 1; *Williams* v. *Fears,* 179 U. S. 270; *Ware & Leland* v. *Mobile County,* 209 U. S. 405.

The business of appellants is not like that of solicitors who negotiate sales of goods in one State to be shipped from another State, because when the livestock come into the possession of appellants, the transportation has

ceased. The livestock are not shipped by the owners for delivery to any definite purchaser, nor is their shipment in interstate commerce induced by the appellants. *Pennsylvania R. R. Co.* v. *Knight,* 192 U. S. 21.

Paraphrasing the language in the *Knight Case:* If the appellants are engaged in interstate commerce merely because they perform a service concerning livestock which may have been, or perhaps may thereafter become, subjects of interstate commerce, are also the men who unload the hay and corn into the troughs in the cattle pens engaged in interstate commerce, and likewise the man who opens the gates leading into the various alleys and pens to permit the animals to pass from one part of the stockyards to another? The same question may be asked of the men who pour water into drinking troughs and who look after the sanitary conditions of the pens, as well as those who drive the cattle from one pen to another; and if these questions are to be answered in the affirmative, the query of Justice Brewer comes naturally to mind, "Where will the limit be?" The line of distinction heretofore prevailing between state and national control over commerce will be obliterated. *Employers' Liability Cases,* 207 U. S. 463, 502; *Hammer* v. *Dagenhart,* 247 U. S. 251.

The power to regulate commerce among the States has never been construed to give authority to Congress to fix the prices at which commodities shipped in interstate commerce could be bought or sold. If such power were exerted, it would deny to the citizens of the various States the right freely to bargain and negotiate concerning the price of the fruits of their labors. It would enable the legislative department to destroy commerce, which would be contrary to the constitutional provision which confers power to regulate. Assuming that the owner of cattle shipped from some other State to the Union Stock Yards at Chicago for sale is engaged in interstate com-

merce, does it follow that Congress has the constitutional power to legislate as to the price at which his livestock must be sold? And if not, how can the power be claimed for Congress, as it has done in the Packers and Stockyards Act, 1921, to fix the price which should be paid by such shipper for services performed for him in selling his livestock by a livestock commission merchant whom he employs at the Chicago market for that purpose? And again, how can the power be claimed for Congress to fix the price which the commission man shall charge for his services in respect to livestock which he purchases or sells upon the market? To concede such power is to deprive the appellants of any individual right to appraise or value their own services. *Northern Securities Co.* v. *United States,* 193 U. S. 197, 361; *In re Greene,* 52 Fed. 104. *Wilson* v. *New,* 243 U. S. 332, distinguished.

The Packers and Stockyards Act, 1921, does not deal with questions of combination or conspiracy in restraint of interstate commerce but is intended to regulate and control those at which it is aimed in the conduct of interstate commerce by them. Therefore, only those who are actually themselves engaged in interstate commerce in livestock and the other products named in the title of the act come within its regulatory provisions. *Swift & Co.* v. *United States,* 196 U. S. 375, distinguished.

The act violates the Fifth Amendment because of the arbitrary classification of stockyards subject to the act. *Giozza* v. *Tiernan,* 148 U. S. 657; Willoughby on the Constitution, p. 874; *Cotting* v. *Kansas City Stock Yards Co.,* 183 U. S. 79.

The act violates the Fourth and Fifth Amendments in authorizing unreasonable searches and seizures of appellants' papers and in compelling appellants to furnish evidence against themselves. *Boyd* v. *United States,* 116 U. S. 616; *Veeder* v. *United States,* 252 Fed. 414, 418; *Ellis* v. *Interstate Commerce Commission,* 237 U. S. 434, 445.

No immunity is conferred by the act, and, therefore, evidence secured by the Secretary and his subordinates under the statute and regulations of the Secretary might be used against the commission man as a basis for the recovery of the penalties imposed by the act or for a prosecution to enforce its criminal provisions. Such a search, even without seizure, would subject the commission man to the danger of prosecution and would in effect compel him to give evidence against himself if the statute applies to him, and is otherwise enforcible, contrary to the provisions of the Fifth Amendment. *Hale* v. *Henkel,* 201 U. S. 43, 71.

*Mr. Levy Mayer,* for appellants, in No. 691.

The decision below rests upon the syllogism that "the stockyards themselves are instrumentalities of interstate commerce" and the dealers in livestock at the yards are "engaged in or participating in that commerce within the stockyards;" *ergo,* the dealers are engaged in interstate commerce and subject to the regulatory power of Congress. We submit that both premise and conclusion are wrong. The dealers are not engaged in "commerce within the stockyards."

We do not read the decisions in *United States* v. *Union Stock Yard Co.,* 226 U. S. 286, and *Covington Stock-Yards Co.* v. *Keith,* 139 U. S. 128, as holding that stockyards in all their divisions and ramifications are "instrumentalities of interstate commerce." Very many services that the stockyards companies render at their yards are distinct from and not at all such as fall within the Commerce Clause. See *Pennsylvania R. R. Co.* v. *Knight,* 192 U. S. 21.

In *Dahnke-Walker Milling Co.* v. *Bondurant,* 257 U. S. 282, this court quotes approvingly from *Kidd* v. *Pearson,* 128 U. S. 1, thus: "Buying and selling and the transportation incidental thereto constitute commerce." In

the present case the undisputed facts show that transportation is neither directly, indirectly nor incidentally connected with the buying or selling of livestock by the dealers.

*Swift & Co.* v. *United States,* 196 U. S. 375, is not applicable. The court below picks out from the body of the opinion a sentence which is descriptive of only one link in the entire scheme which was condemned by this court. Furthermore, this court did not modify the doctrine established in *Hopkins* v. *United States,* 171 U. S. 578, or in *Anderson* v. *United States,* 171 U. S. 604. See 196 U. S. 397. *Blumenstock Bros. Advertising Agency* v. *Curtis Publishing Co.,* 252 U. S. 436.

As appellants are not engaged in interstate commerce, those parts of the Stock Yards Act which seek to control and regulate their business are unconstitutional. *In re Greene,* 52 Fed. 104, 113; *Hammer* v. *Dagenhart,* 247 U. S. 251; *Blumenstock Bros. Advertising Agency* v. *Curtis Publishing Co.,* 252 U. S. 436; *Ware & Leland* v. *Mobile County,* 209 U. S. 405; *United States Fidelity & Guaranty Co.* v. *Kentucky,* 231 U. S. 394; *Wagner* v. *Covington,* 251 U. S. 95; *Danciger* v. *Cooley,* 248 U. S. 319; *Chicago, Milwaukee & St. Paul Ry. Co.* v. *Iowa,* 233 U. S. 334; *Bacon* v. *Illinois,* 227 U. S. 504; *Gulf, Colorado & Santa Fe Ry. Co.* v. *Texas,* 204 U. S. 403; *Hopkins* v. *United States,* 171 U. S. 578; *Winslow* v. *Federal Trade Commission,* 277 Fed. 206; *Ward Baking Co.* v. *Federal Trade Commission,* 264 Fed. 330.

To paraphrase the language of this court in *Hooper* v. *California,* 155 U. S. 648, 655: If Congress can apply the power to regulate interstate commerce to all the incidents connected with that commerce, that power will soon embrace the entire sphere of mercantile activity in any way connected with trade between the States, and will soon exclude state control over contracts and commerce that are purely domestic in their nature.

*Mr. Solicitor General Beck,* with whom *Mr. Blackburn Esterline,* Special Assistant to the Attorney General, and *Mr. Bayard T. Hainer* were on the brief, for appellees.

The power of Congress or its appropriate agencies to prescribe, regulate or control all instrumentalities, or parts thereof, by which interstate commerce is carried on or conducted is now thoroughly established.

That the Union Stock Yard & Transit Company of Chicago, which furnishes terminal facilities at the greatest livestock market in the world, is now embraced within, and constitutes a part of, those instrumentalities of interstate commerce as fully and completely as if they were an integral part of a great railroad system, and should be regulated as such, is beyond question. *United States* v. *Union Stock Yard Co.,* 226 U. S. 286, 303, 306. See also *Chicago Live Stock Exchange* v. *A. T. & S. F. Ry. Co.,* 52 I. C. C. 209, 224; *Chicago Live Stock Exchange* v. *A. T. & S. F. Ry. Co.,* 58 I. C. C. 164, 166, 168; *Live Stock Loading and Unloading Charges,* 61 I. C. C. 223; *Union Stock Yards Co.* v. *United States,* 169 Fed. 406; *United States* v. *Union Stock Yards Co.,* 161 Fed. 919; *United States* v. *Sioux City Stock Yards,* 162 Fed. 556; *Covington Stock Yards* v. *Keith,* 139 Fed. 128; *Walker* v. *Keenan,* 73 Fed. 755.

The commission merchants and traders or dealers operating in the Union Stock Yards are so completely identified with and so directly a part of the current of interstate commerce of livestock flowing through those yards as clearly to bring them and their transactions within the power of Congress to regulate under the Packers and Stockyards Act.

That act is a combination of the principles embraced within both the Act to Regulate Commerce as amended and the Sherman Anti-Trust Act. By a single statute Congress embraced both the transportation of livestock and the commercial transactions therein in interstate com-

merce, including the meat-packing industries—in all of their multitudinous aspects.  Congress also embraced within the act the legal principles announced in many opinions of this court.  See, e. g., *Swift & Co.* v. *United States,* 196 U. S. 375.

Congress, having legislated on a vast and vital subject and all of its ramifications as an entirety, the judicial review should go on lines no less extensive.  See *United States* v. *Brigantine William* (Dist. Ct., Mass., 1808), 2 Hall's Law Journal, 255, 271.  The present case is not one to be examined, as opposing counsel would argue, through the small end of a telescope.

The question here is not whether the commission merchants and dealers should be included within the act by judicial interpretation, as in *Hopkins* v. *United States,* 171 U. S. 578, but whether Congress had the power to designate them and their transactions as part of the "current of commerce" and as such within the act.  Even in the absence of such specific designation, they might well be included, for they form as much a part of the "current of commerce" as the railroads or the stockyards company. *Swift & Co.* v. *United States, supra,* distinguishing *Hopkins* v. *United States, supra,* and *Anderson* v. *United States,* 171 U. S. 604.

*Hopkins* v. *United States* itself announced the principle on which the present legislation rests, when the court said (p. 597) that the term "interstate commerce," which is one of "very large significance," comprehends "intercourse for the purposes of trade in any and all its forms, including transportation, purchase, sale and exchange of commodities between the citizens of different States, and the power to regulate it embraces all the instruments by which such commerce may be conducted.  *Welton* v. *Missouri,* 91 U. S. 275; *Mobile County* v. *Kimball,* 102 U. S. 691; *Gloucester Ferry Co.* v. *Pennsylvania,* 114 U. S. 196; *Hooper* v. *California,* 155 U. S. 648, 653; *United States* v.

*Knight Co.,* 156 U. S. 1." See also *Chicago Board of Trade* v. *United States,* 246 U. S. 231.

The shipper is a consignor of interstate commerce, who delivers to an interstate carrier livestock consigned to a consignee of interstate commerce; and during the entire time the livestock are in the stockyards they are in the custody of the Union Stock Yard & Transit Company, also an interstate carrier, which unloads, feeds, waters, and beds them in its chutes, pens and other facilities. The latter company deals with the railroads and the commission merchant who represents the consignor. If the relation of the Stock Yard Company and the consignor is that of shipper and carrier in interstate commerce, how may the commission merchant who conducts the sale and makes the payments to these common carriers of all their charges be eliminated? The commission merchants pay the carriers the full charges for freight, yardage, feed and service, and if the carriers should refund to certain merchants parts of these rates, could the charge of discrimination or rebating be defended on the ground that so far as the commission merchants were concerned the transactions were not in interstate commerce? It is useful to bear in mind that the entire " current of commerce " flows through the Union Stock Yards and that all transactions in connection therewith are conducted within the enclosure of the Union Stock Yards. That is likewise true of the purchases and sales of the traders. While this " current of commerce " is swirling around within the 550 acres of enclosure of the Union Stock Yards, it is the judgment of Congress that every person and transaction which constitutes a continuing part of that current is subject to the Packers and Stockyards Act. These appellants are in much the same position as if consignor, consignee, commission merchants and traders all got aboard the trains and traveled with the livestock, say from Denver to Chicago, and traded therein

*en route.* The recent decisions of the court abundantly sustain the power of Congress so to regulate such commerce. *United States* v. *Ferger,* 250 U. S. 199, 203; *Eureka Pipe Line Co.* v. *Hallanan,* 257 U. S. 265; *United Fuel Gas Co.* v. *Hallanan,* 257 U. S. 277; *Dahnke-Walker Milling Co.* v. *Bondurant,* 257 U. S. 282; *Lemke* v. *Farmers Grain Co.,* 258 U. S. 50.

In exempting from its provisions stockyards of which the area normally available for handling livestock is less than 20,000 square feet, the act does not make an arbitrary classification in violation of the Fifth Amendment. *Wilson* v. *New,* 243 U. S. 332.

The provisions of the act requiring a commission merchant who falls within the classification of market agency to register by giving to the Secretary of Agriculture his name and the character of his business, and the kind of stockyard service, if any, which he furnishes at such stockyard (§ 303); file a schedule of rates and charges (§ 306); and keep such accounts, etc., as fully and correctly disclose all transactions involved in his business (§ 401), do not violate the Fourth Amendment, prohibiting unreasonable searches and seizures.

The form of the legislation is taken from the Interstate Commerce Act. Section 20 of the Act to Regulate Commerce (24 Stat. 379, 386; 34 Stat. 584, 593; 41 Stat. 456, 493) contains provisions for reports far more searching than any contained in this act. *Interstate Commerce Commission* v. *Goodrich Transit Co.,* 224 U. S. 194.

The Packers and Stockyards Act provides that all rates, charges, and services shall be just, reasonable, and non-discriminatory, and the provisions above referred to are merely supervisory or regulatory powers which have precedent in the Interstate Commerce Acts.

At this point it is noteworthy that Congress adopted for and wrapped around the Packers and Stockyards Act like

a cloak the same court procedure for the enforcement or
annulment of the orders of the Secretary as obtains for
the enforcement or annulment of the orders of the Com-
mission (§§ 315, 316; see also House Committee Report,
pp. 4–11)..

Moreover, the court will not attempt to pass on the
reasonableness of the rules and regulations of the Secre-
tary of Agriculture, or to define his powers by a construc-
tion of the act, in advance of a concrete case raising a
specific issue, as held in *Interstate Commerce Commission*
v. *Goodrich Transit Co., supra,* and *Texas* v. *Interstate
Commerce Commission,* 258 U. S. 158.

MR. CHIEF JUSTICE TAFT, after making the foregoing
statement of the case, delivered the opinion of the court.

Section 316 of the Packers and Stockyards Act of 1921
makes applicable to suits for injunction against the orders
of the Secretary of Agriculture, the same procedure, orig-
inal and appellate, provided in the Act of October 22,
1913, c. 32, 38 Stat. 208, 219, 220, for suits for injunction
against the orders of the Interstate Commerce Commis-
sion. The latter act gives a right to a direct appeal to this
court from the granting or refusing an interlocutory in-
junction. Hence the appeals herein are properly prose-
cuted.

In each bill the averments are sufficient, if the act be
invalid, to show equitable grounds for injunction in the
severe penalties incurred for failure to comply with the
act before opportunity can be given to test its validity.
*Ex parte Young,* 209 U. S. 123.

We have framed the statement of the case, not for the
purpose of deciding the issues of fact mooted between the
packers and their accusers before the Federal Trade Com-
mission or the Committees on Agriculture in Congress,
but only to enable us to consider and discuss the act whose
validity is here in question in the light of the environ-

ment in which Congress passed it. It was for Congress to decide, from its general information and from such special evidence as was brought before it, the nature of the evils actually present or threatening, and to take such steps by legislation within its power as it deemed proper to remedy them. It is helpful for us in interpreting the effect and scope of the act in order to determine its validity to know the conditions under which Congress acted. *Chicago Board of Trade* v. *United States*, 246 U. S. 231, 238; *Danciger* v. *Cooley*, 248 U. S. 319, 322.

The Packers and Stockyards Act of 1921 seeks to regulate the business of the packers done in interstate commerce and forbids them to engage in unfair, discriminatory or deceptive practices in such commerce, or to subject any person to unreasonable prejudice therein, or to do any of a number of acts to control prices or establish a monopoly in the business. It constitutes the Secretary of Agriculture a tribunal to hear complaints and make findings thereon, and to order the packers to cease any forbidden practice. An appeal is given to the Circuit Court of Appeals from these findings and orders. They are to be enforced by the District Court by penalty if not appealed from and if disobeyed. Title III concerns the stockyards and provides for the supervision and control of the facilities furnished therein in connection with the receipt, purchase, sale on commission basis or otherwise, of live stock and its care, shipment, weighing or handling in interstate commerce. A stockyards is defined to be a place conducted for profit as a public market, with pens in which live stock are received and kept for sale or shipment in interstate commerce. Yards with a superficial area of less than 20,000 square feet are not within the act. Stockyard owners, commission men and dealers are recognized and defined and the two latter are required to register. The act requires that all rates and charges for services and facilities in the stockyards and all practices in

connection with the live stock passing through the yards
shall be just, reasonable, non-discriminatory and non-de-
ceptive, and that a schedule of such charges shall be kept
open for public inspection and only be changed after ten
days' notice to the Secretary of Agriculture, who is made
a tribunal to inquire as to the justice, reasonableness and
non-discriminatory or non-deceptive character of every
charge and practice, and to order that it cease, if found to
offend, with the same provisions for appeal and enforce-
ment in court as in the case of offending packers. The
Secretary is given power to make rules and regulations to
carry out the provisions, to fix rates or a minimum or
maximum thereof and to prescribe how every packer,
stockyard owner, commission man and dealer shall keep
accounts.

The bills aver that the Secretary has given the notice
which requires appellants to register and has announced
proposed rules and regulations, prescribing the form of
rate schedules, the required reports, including daily ac-
counts of receipts, sales and shipments, forbidding mis-
leading reports to depress or enhance prices, prescribing
proper feed and care of live stock, and forbidding a com-
mission man to sell live stock to another in whose business
he is interested, without disclosing such interest to his
principal.

The object to be secured by the act is the free and un-
burdened flow of live stock from the ranges and farms of
the West and the Southwest through the great stock-
yards and slaughtering centers on the borders of that
region, and thence in the form of meat products to the
consuming cities of the country in the Middle West and
East, or, still as live stock, to the feeding places and fat-
tening farms in the Middle West or East for further
preparation for the market.

The chief evil feared is the monopoly of the packers,
enabling them unduly and arbitrarily to lower prices to

the shipper who sells, and unduly and arbitrarily to increase the price to the consumer who buys. Congress thought that the power to maintain this monopoly was aided by control of the stockyards. Another evil which it sought to provide against by the act, was exorbitant charges, duplication of commissions, deceptive practices in respect of prices, in the passage of the live stock through the stockyards, all made possible by collusion between the stockyards management and the commission men, on the one hand, and the packers and dealers on the other. Expenses incurred in the passage through the stockyards necessarily reduce the price received by the shipper, and increase the price to be paid by the consumer. If they be exorbitant or unreasonable, they are an undue burden on the commerce which the stockyards are intended to facilitate. Any unjust or deceptive practice or combination that unduly and directly enhances them is an unjust obstruction to that commerce. The shipper whose live stock are being cared for and sold in the stockyards market is ordinarily not present at the sale, but is far away in the West. He is wholly dependent on the commission men. The packers and their agents and the dealers who are the buyers, are at the elbow of the commission men, and their relations are constant and close. The control that the packers have had in the stockyards by reason of ownership and constant use, the relation of landlord and tenant between the stockyards owner, on the one hand, and the commission men and the dealers, on the other, the power of assignment of pens and other facilities by that owner to commission men and dealers, all create a situation full of opportunity and temptation to the prejudice of the absent shipper and owner in the neglect of the live stock, in the *mala fides* of the sale, in the exorbitant prices obtained, in the unreasonableness of the charges for services rendered.

The stockyards are not a place of rest or final destination. Thousands of head of live stock arrive daily by

carload and trainload lots, and must be promptly sold and disposed of and moved out to give place to the constantly flowing traffic that presses behind. The stockyards are but a throat through which the current flows, and the transactions which occur therein are only incident to this current from the West to the East, and from one State to another. Such transactions can not be separated from the movement to which they contribute and necessarily take on its character. The commission men are essential in making the sales without which the flow of the current would be obstructed, and this, whether they are made to packers or dealers. The dealers are essential to the sales to the stock farmers and feeders. The sales are not in this aspect merely local transactions. They create a local change of title, it is true, but they do not stop the flow; they merely change the private interests in the subject of the current, not interfering with, but, on the contrary, being indispensable to its continuity. The origin of the live stock is in the West, its ultimate destination known to, and intended by, all engaged in the business is in the Middle West and East either as meat products or stock for feeding and fattening. This is the definite and well-understood course of business. The stockyards and the sales are necessary factors in the middle of this current of commerce.

The act, therefore, treats the various stockyards of the country as great national public utilities to promote the flow of commerce from the ranges and farms of the West to the consumers in the East. It assumes that they conduct a business affected by a public use of a national character and subject to national regulation. That it is a business within the power of regulation by legislative action needs no discussion. That has been settled since the case of *Munn* v. *Illinois*, 94 U. S. 113. Nor is there any doubt that in the receipt of live stock by rail and in their delivery by rail the stockyards are an interstate commerce

agency. *United States* v. *Union Stock Yard Co.,* 226 U. S. 286. The only question here is whether the business done in the stockyards between the receipt of the live stock in the yards and the shipment of them therefrom is a part of interstate commerce, or is so associated with it as to bring it within the power of national regulation. A similar question has been before this court and had great consideration in *Swift & Co.* v. *United States,* 196 U. S. 375. The judgment in that case gives a clear and comprehensive exposition which leaves to us in this case little but the obvious application of the principles there declared.

The *Swift Case* presented to this court the sufficiency of a bill in equity brought against substantially the same packing firms as those against whom this legislation is chiefly directed, charging them as a combination of a dominant proportion of the dealers in fresh meat throughout the United States not to bid against each other in the live stock markets of the different States, to bid up prices for a few days in order to induce the cattle men to send their stock to the stockyards, to fix prices at which they would sell, and to that end to restrict shipments of meat when necessary, to establish a uniform credit to dealers, and to keep a black list, to make uniform and improper charges for cartage, and finally to get less than lawful rates from the railroads to the exclusion of competitors, and all this in a conspiracy and single connected scheme to monopolize the supply and distribution of fresh meats throughout the United States. In holding the bill good, this court said (p. 396):

" The scheme as a whole seems to us to be within reach of the law. The constituent elements, as we have stated them, are enough to give to the scheme a body and, for all that we can say, to accomplish it. . . . It is suggested that the several acts charged are lawful and that intent can make no difference. But they are bound to-

gether as parts of a single plan. The plan may make the parts unlawful. *Aikens* v. *Wisconsin,* 196 U. S. 194, 206. The statute gives this proceeding against combinations in restraint of commerce among the States and against attempts to monopolize the same. Intent is almost essential to such a combination and is essential to such an attempt."

Again (pp. 396 and 397):

"Although the combination alleged embraces restraint and monopoly of trade within a single State, its effect upon commerce among the States is not accidental, secondary, remote or merely probable. . . . Here the subject matter is sales and the very point of the combination is to restrain and monopolize commerce among the States in respect of such sales."

Again (pp. 398 and 399), in answer to the objection that what was charged did not constitute a case involving commerce among the States, the court said:

" Commerce among the States is not a technical legal conception, but a practical one, drawn from the course of business. When cattle are sent for sale from a place in one State, with the expectation that they will end their transit, after purchase, in another, and when in effect they do so, with only the interruption necessary to find a purchaser at the stock yards, and when this is a typical, constantly recurring course, the current thus existing is a current of commerce among the States, and the purchase of the cattle is a part and incident of such commerce. What we say is true at least of such a purchase by residents in another State from that of the seller and of the cattle."

The application of the commerce clause of the Constitution in the *Swift Case* was the result of the natural development of interstate commerce under modern conditions. It was the inevitable recognition of the great

central fact that such streams of commerce from one part
of the country to another which are ever flowing are in
their very essence the commerce among the States and
with foreign nations which historically it was one of the
chief purposes of the Constitution to bring under national
protection and control. This court declined to defeat this
purpose in respect of such a stream and take it out of
complete national regulation by a nice and technical in-
quiry into the non-interstate character of some of its
necessary incidents and facilities when considered alone
and without reference to their association with the move-
ment of which they were an essential but subordinate
part.

The principles of the *Swift Case* have become a fixed
rule of this court in the construction and application of
the commerce clause. Its latest expression on the sub-
ject is found in *Lemke* v. *Farmers Grain Co., ante,* 50.
In that case it was held, on the authority of the *Swift
Case,* that the delivery and sale of wheat by farmers to
local grain elevators in North Dakota to be shipped to
Minneapolis, when practically all the wheat purchased by
such elevators was so shipped and the price was fixed by
that in the Minneapolis market less profit and freight,
constituted a course of business and determined the in-
terstate character of the transaction. Accordingly a state
statute which sought to regulate the price and profit of
such sales and was found to interfere with the free flow
of interstate commerce, was declared invalid as a viola-
tion of the commerce clause. Similar confirmation of the
principle of the *Swift Case* is to be found in *Dahnke-
Walker Milling Co.* v. *Bondurant,* 257 U. S. 282; *Eureka
Pipe Line Co.* v. *Hallanan,* 257 U. S. 265; *United Fuel
Gas Co.* v. *Hallanan,* 257 U. S. 277; *Western Union Tele-
graph Co.* v. *Foster,* 247 U. S. 105, 113; *United States* v.

*Reading Co.,* 226 U. S. 324, 367, 368; *Ohio Railroad Com-mission* v. *Worthington,* 225 U. S. 101, 108; and *Loewe* v. *Lawlor,* 208 U. S. 274, 301.

It is manifest that Congress framed the Packers and Stockyards Act in keeping with the principles announced and applied in the opinion in the *Swift Case.* The recital in § 2, par. b of Title I of the act quoted in the margin leaves no doubt of this.[1] The act deals with the same current of business, and the same practical conception of interstate commerce.

Of course, what we are considering here is not a bill in equity or an indictment charging conspiracy to obstruct interstate commerce, but a law. The language of the law shows that what Congress had in mind primarily was to prevent such conspiracies by supervision of the agencies which would be likely to be employed in it. If Congress could provide for punishment or restraint of such conspiracies after their formation through the Anti-Trust Law as in the *Swift Case,* certainly it may provide regulation to prevent their formation. The reasonable fear by Congress that such acts, usually lawful and affecting only intrastate commerce when considered alone, will probably

---

[1] The first title, § 2, paragraph b, provides that " for the purpose of this Act . . . a transaction in respect to any article shall be considered to be in commerce if such article is part of that current of commerce usual in the live-stock and meat-packing industries, whereby live stock [and its products] are sent from one State with the expectation that they will end their transit, after purchase, in another, including, in addition to cases within the above general description, all cases where purchase or sale is either for shipment to another State, or for slaughter of live stock within the State and the shipment outside the State of the products resulting from such slaughter. Articles normally in such current of commerce shall not be considered out of such current through resort being had to any means or device intended to remove transactions in respect thereto from the provisions of this Act."

and more or less constantly be used in conspiracies against interstate commerce or constitute a direct and undue burden on it, expressed in this remedial legislation, serves the same purpose as the intent charged in the Swift indictment to bring acts of a similar character into the current of interstate commerce for federal restraint. Whatever amounts to more or less constant practice, and threatens to obstruct or unduly to burden the freedom of interstate commerce is within the regulatory power of Congress under the commerce clause, and it is primarily for Congress to consider and decide the fact of the danger and meet it. This court will certainly not substitute its judgment for that of Congress in such a matter unless the relation of the subject to interstate commerce and its effect upon it are clearly non-existent.

In *United States* v. *Ferger,* 250 U. S. 199, the validity of an act of Congress punishing forgery and utterance of bills of lading for fictitious shipments in interstate commerce was in question. It was contended that there was and could be no commerce in a fraudulent and fictitious bill of lading, and therefore that the power of Congress could not embrace such pretended bill. In upholding the act, this court, speaking through Chief Justice White, answered the objection by saying:

" But this mistakenly assumes that the power of Congress is to be necessarily tested by the intrinsic existence of commerce in the particular subject dealt with, instead of by relation of that subject to commerce and its effect upon it. We say mistakenly assumes, because we think it clear that if the proposition were sustained it would destroy the power of Congress to regulate, as obviously that power, if it is to exist, must include the authority to deal with obstructions to interstate commerce (*In re Debs,* 158 U. S. 564) and with a host of other acts which, because of their relation to and influence upon interstate

commerce, come within the power of Congress to regulate, although they are not interstate commerce in and of themselves."

The Transportation Act of 1920 presents a close analogy to this case. It authorizes supervision by the Interstate Commerce Commission of intrastate commerce where it is so carried on as to work undue, unreasonable advantage or preference in favor of persons or localities in intrastate commerce, as against those in interstate commerce, or any undue, unjust or unreasonable discrimination against interstate commerce itself. *Railroad Commission of Wisconsin* v. *Chicago, Burlington & Quincy R. R. Co.*, 257 U. S. 563. That case followed the *Minnesota Rate Cases*, 230 U. S. 352, 432, 433; *Shreveport Case*, 234 U. S. 342, 351; *Illinois Central R. R. Co.* v. *State Public Utilities Commission*, 245 U. S. 493; *Baltimore & Ohio R. R. Co.* v. *Interstate Commerce Commission*, 221 U. S. 612, 618; *Southern Ry. Co.* v. *United States*, 222 U. S. 20, 26, 27; *Second Employers' Liability Cases*, 223 U. S. 1, 48, 51. The principle of these cases is thus clearly stated by the court in the *Minnesota Rate Cases* (p. 399):

" The authority of Congress extends to every part of interstate commerce, and to every instrumentality or agency by which it is carried on; and the full control by Congress of the subjects committed to its regulation is not to be denied or thwarted by the commingling of interstate and intrastate operations. This is not to say that the Nation may deal with the internal concerns of the State, as such, but that the execution by Congress of its constitutional power to regulate interstate commerce is not limited by the fact that intrastate transactions may have become so interwoven therewith that the effective government of the former incidentally controls the latter. This conclusion necessarily results from the supremacy of the national power within its appointed sphere."

In § 311 of the act, quoted in the margin,[1] Congress gives to the Secretary of Agriculture in respect to intra- state transactions that affect prejudicially interstate com- merce under his protection, the same powers given to the Interstate Commerce Commission in respect to intrastate commerce which affects prejudicially interstate railroad commerce in paragraph 4, § 13 of the Interstate Com- merce Act, as amended in § 416 of the Transportation Act of 1920. This was the paragraph and section which were enforced in *Railroad Commission of Wisconsin* v. *Chicago, Burlington & Quincy R. R. Co., supra,* and the validity of which was upheld by this court.

Counsel for appellants cite cases to show that trans- actions like those of the commission men or dealers here are not interstate commerce or within the power of Con- gress to regulate. The chief of these are *Hopkins* v.

---

[1] Section 311 is as follows:

"Whenever in any investigation under the provisions of this title, or in any investigation instituted by petition of the stockyard owner or market agency concerned, which petition is hereby authorized to be filed, the Secretary after full hearing finds that any rate, charge, regulation, or practice of any stockyard owner or market agency, for or in connection with the buying or selling on a commission basis or otherwise, receiving, marketing, feeding, holding, delivery, shipment, weighing, or handling, not in commerce, of live stock, causes any undue or unreasonable advantage, prejudice, or preference as be- tween persons or localities in intrastate commerce in live stock on the one hand and interstate or foreign commerce in live stock on the other hand, or any undue, unjust, or unreasonable discrimination against interstate or foreign commerce in live stock, which is hereby forbidden and declared to be unlawful, the Secretary shall prescribe the rate, charge, regulation, or practice thereafter to be observed, in such manner as, in his judgment, will remove such advantage, preference, or discrimination. Such rates, charges, regulations, or practices shall be observed while in effect by the stockyard owners or market agencies parties to such proceeding affected thereby, the law of any State or the decision or order of any State authority to the contrary notwithstanding."

*United States,* 171 U. S. 578, and *Anderson* v. *United States,* 171 U. S. 604. These cases were considered in the *Swift Case* and disposed of by the court as follows (p. 397):

" So, again, the line is distinct between this case and *Hopkins* v. *United States,* 171 U. S. 578. All that was decided there was that the local business of commission merchants was not commerce among the States, even if what the brokers were employed to sell was an object of such commerce. The brokers were not like the defendants before us, themselves the buyers and sellers. They only furnished certain facilities for the sales. Therefore, there again the effects of the combination of brokers upon the commerce was only indirect and not within the act. Whether the case would have been different if the combination had resulted in exorbitant charges, was left open. In *Anderson* v. *United States,* 171 U. S. 604, the defendants were buyers and sellers at the stock yards, but their agreement was merely not to employ brokers, or to recognize yard-traders, who were not members of their association. Any yard-trader could become a member of the association on complying with the conditions, and there was said to be no feature of monopoly in the case. It was held that the combination did not directly regulate commerce between the States, and, being formed with a different intent, was not within the act. The present case is more like *Montague & Co.* v. *Lowry,* 193 U. S. 38."

It is clear from this that if the bill in the *Swift Case* had averred that control of the stockyards and the commission men was one of the means used by the packers to make arbitrary prices in their plan of monopolizing the interstate commerce, the acts of the stockyards owners and commission men would have been regarded as directly affecting interstate commerce and within the Anti-Trust Act. Congress has found an evil to be apprehended and to be prevented by the act here in question, in the

use and control of stockyards and the commission men to promote a packers' monopoly of interstate commerce. The act finds and imports this injurious direct effect of such agencies upon interstate commerce just as the intent of the conspiracy charged in the indictment in the *Swift Case* tied together the parts of the scheme there attacked and imported their direct effect upon interstate commerce.

Again, if the result of the combination of commission men in the *Hopkins Case* had been to impose exorbitant charges on the passage of the live stock through the stockyards from one State to another, the case would have been different, as the court suggests. The effect on interstate commerce in such a case would have been direct. Similarly in the *Anderson Case* if the combination of dealers had been directed to collusion with the commission men to secure sales at unduly low prices to the dealers and to double commissions, or to practice any other fraud or oppression calculated to decrease the price received by the shipper and increase the price to the purchaser in the passage of live stock through the stockyards in interstate commerce, this would have been a direct burden on such commerce and within the Anti-Trust Act.

The other cases relied on by appellants are less relevant to this discussion than the *Anderson* and *Hopkins Cases.* Some of them are tax cases. As to them it is well to bear in mind the words of the court in the *Swift Case* (p. 400):

"But we do not mean to imply that the rule which marks the point at which state taxation or regulation becomes permissible necessarily is beyond the scope of interference by Congress in cases where such interference is deemed necessary for the protection of commerce among the States."

Thus, take the case of *Bacon* v. *Illinois*, 227 U. S. 504. Bacon had purchased grain in transit from a western State to the east. He exercised the power under his con-

tract to stop the grain in Illinois and put it in a grain elevator there. He intended to send it on to some other State for sale. He might have changed his mind. He did, however, after a time, send it out of the State. The grain was taxed while it was in Illinois. The question was whether it was immune from taxation because in transit in interstate commerce. Following the cases of *Woodruff* v. *Parham,* 8 Wall. 123; *Coe* v. *Errol,* 116 U. S. 517; *Brown* v. *Houston,* 114 U. S. 622; *Pittsburgh & Southern Coal Co.* v. *Bates,* 156 U. S. 577; *Diamond Match Co.* v. *Ontonagon,* 188 U. S. 82, 93, 96; *Kelley* v. *Rhoads,* 188 U. S. 1, 5, 7; *General Oil Co.* v. *Crain,* 209 U. S. 211; and *American Steel & Wire Co.* v. *Speed,* 192 U. S. 500, it was held that property in a State which its owner intends to transport to some other State, but which is not in actual transit and in respect to the disposition of which he may change his mind is not in interstate commerce just because of the intention of its owner, and may, therefore, be taxed by the State where it is. The court brought out the distinction between such cases and this in the remark (p. 516):

" The question, it should be observed, is not with respect to the extent of the power of Congress to regulate interstate commerce, but whether a particular exercise of state power in view of its nature and operation must be deemed to be in conflict with this paramount authority."

Moreover, it will be noted that even in tax cases where the tax is directed against a commodity in an actual flowing and constant stream out of a State from which the owner may withdraw part of it for use or sale in the State before it reaches the state border, we have held that a tax on the flow is a burden on interstate commerce which the State may not impose because such flow in interstate commerce is an established course of business. *United Fuel Gas Co.* v. *Hallanan,* 257 U. S. 277; *Eureka*

*Pipe Line Co.* v. *Hallanan*, 257 U. S. 265. In the former, the court summed up as follows:

" In short, the great body of the gas starts for points outside the State and goes to them. That the necessities of business require a much smaller amount destined to points within the State to be carried undistinguished in the same pipes does not affect the character of the major transportation. Neither is the case as to the gas sold to the three companies changed by the fact that the plaintiff, as owner of the gas, and the purchasers after they receive it might change their minds before the gas leaves the State and that the precise proportions between local and outside deliveries may not have been fixed, although they seem to have been. The typical and actual course of events marks the carriage of the greater part as commerce among the States and theoretical possibilities may be left out of account. There is no break, no period of deliberation, but a steady flow ending as contemplated from the beginning beyond the state line. *Ohio R. R. Commission* v. *Worthington*, 225 U. S. 101, 108. *United States* v. *Reading Co.*, 226 U. S. 324, 367. *Western Union Telegraph Co.* v. *Foster*, 247 U. S. 105, 113."

The case of *Blumenstock Brothers Advertising Agency* v. *Curtis Publishing Co.*, 252 U. S. 436, is easily distinguished from the one at the bar. There it was merely held that an attempt of a publisher to monopolize the business of publishing advertising matter in magazines resulting in refusal of such publisher to accept advertisements in his magazines was too remote in its relation to the interstate commerce of circulating magazines. The court said:

" This case is wholly unlike *International Textbook Co.* v. *Pigg*, 217 U. S. 91, wherein there was a continuous interstate traffic in textbooks and apparatus for a course of study pursued by means of correspondence, and the movements in interstate commerce were held to bring the sub-

ject-matter within the domain of federal control, and to exempt it from the burden imposed by state legislation."

*Pennsylvania R. R. Co.* v. *Knight,* 192 U. S. 21, relied on by counsel for appellants and said to be exactly applicable to the case at bar, was an effort by the Pennsylvania Railroad Company to secure immunity from city regulation for a cab system which it ran in New York to and from its station to points in New York City, on the ground that it was part of interstate commerce. This court held that because it was independent of the railroad transportation, and not included in the contract of railroad carriage, it did not come within interstate commerce. The case was distinguished in the *Swift Case* (p. 401) from cartage for delivery of the goods when part of the contemplated transit. There is nothing in the case to indicate that if such an agency could be and were used in a conspiracy unduly and constantly to monopolize interstate passenger traffic, it might not be brought within federal restraint.

As already noted, the word "commerce" when used in the act is defined to be interstate and foreign commerce. Its provisions are carefully drawn to apply only to those practices and obstructions which in the judgment of Congress are likely to affect interstate commerce prejudicially. Thus construed and applied, we think the act clearly within congressional power and valid.

Other objections are made to the act and its provisions as violative of other limitations of the Constitution, but the only one seriously pressed was that based on the Commerce Clause and we do not deem it necessary to discuss the others.

The orders of the District Court refusing the interlocutory injunctions are

*Affirmed.*

Mr. Justice McReynolds dissents.

Mr. Justice Day did not sit in these cases and took no part in their decision.