**CLEVELAND (City), Plaintiff-Appellee, v. SZABO, Defendant-Appellant.**

Ohio Appeals, Eighth District, Cuyahoga County.

No. 23545. Decided November 2, 1955.

Ralph S. Locher, Director of Law, Bernard J. Conway, Chief Police Prosecutor, Edward V. Cain, Asst. Police Prosecutor, Cleveland, for plaintiff-appellee.

John C. Lyon, for defendant-appellant.

## OPINION

By KOVACHY, PJ.

This cause comes to us on questions of law from the Criminal Branch of the Cleveland Municipal Court.

Defendant-appellant, Edward Szabo, was found guilty of driving a tractor-trailer on the streets of the City of Cleveland without Ohio license plates. He was charged with violating Section 9.3101 of the Traffic Code of the City of Cleveland which reads as follows:

"9.3101 (2426) License Numbers.

"No person shall operate any motor vehicle without the number or numbers required by law or ordinance. Said number or numbers shall at all times be maintained, both as to position and condition thereof so that they shall be plainly visible and free from any substance or material of any kind obscuring them and said numbers shall be at all times maintained in their entirety.

"No placard which purports to be a license placard other than the license number plate or placard required by law to be displayed on motor vehicles shall be displayed on any motor vehicle in the city of Cleveland."

At the time of the arrest, the tractor and trailer bore license plates

issued by the State of Pennsylvania where they had been duly registered in accordance with the laws of that commonwealth. Edward Szabo, at the time, was employed at the Cleveland Freight Terminal of the Baltimore and Pittsburgh Motor Express Company (hereafter called the Company) a Pennsylvania corporation engaged in interstate commerce as a common carrier by motor vehicle and duly authorized by the Interstate Commerce Commission as exemplified by a Certificate of Public Convenience and Necessity issued to it under I. C. C. Docket No. M. C.-1936.

The facts in this case are not in dispute. A shipment of copper billets by tractor-trailer from Baltimore, Maryland, arrived at the Cleveland Freight Terminal of the Company at 8:15 A. M. on April 14, 1955, consigned to the Chase Brass and Copper Company, located at Euclid, Ohio, a suburban city of Greater Cleveland. The tractor that had pulled the shipment from Baltimore was detached and another one, also owned by the Company and bearing Pennsylvania license plates registered in Pennsylvania, was attached. At 10:00 A. M., this tractor-trailer, driven by Edward Szabo, left the Terminal for the plant of the consignee in Euclid. It was on this trip that the arrest took place. The tractor used on this short trip was customarily used to haul trailers between Pittsburgh and Cleveland by the Company.

The City of Cleveland contends that the tractor that was used to haul this shipment from the Cleveland Freight Terminal of the Company to the consignee's plant was engaged in a purely local operation within the State of Ohio and as such, was engaging in intrastate conduct requiring the payment of a fee for registration and issuance of Ohio license plates under Ohio laws.

The defendant, on the other hand, contends that the trip from the Cleveland Freight Terminal of the Company to the consignee's plant, under the circumstances, was an operation still in the flow of interstate commerce and as a result the tractor and trailer used in the operation were exempted from registration and licensing in Ohio by virtue of the Reciprocal Agreement entered into between the State of Ohio and the State of Pennsylvania in the year 1940.

\* \* \* \* \*

**Sec. 4503.36 R. C.** provides as follows:

"The owner of every motor vehicle which is duly registered in any state, district, country, or sovereignty other than this state is exempt from the laws of this state pertaining to registration and licensing and the penal statutes relating thereto, provided the owner thereof has complied with the law in regard to motor vehicles in the state, district, country, or sovereignty of his residence and complies with such law while operating and driving such motor vehicle upon the public roads or highways of this state. Such exemption shall be operative only if the law of such other state, district, country, or sovereignty makes substantially like and equal exemptions to the owners of motor vehicles registered in this state.

"Reciprocal agreements between this and any other state, district, country, or sovereignty necessary in administering this section shall be made as provided in §4503.37 R. C."

A corresponding statute of the State of Pennsylvania, as found in Title 75, Section 99, reads as follows:

"The secretary shall have authority to make agreements with the duly authorized representatives of other states, exempting the residents of such other states using the highways of the Commonwealth from the payment of all or any such taxes, fees, or other charges imposed under this act, with such restrictions, privileges, or lack of them, as he may deem advisable, provided that all vehicles owned by non-residents shall be properly registered in the state of residence of their owner and shall conspicuously display a registration plate, and that residents of this Commonwealth when using the highways of such other state, shall receive exemptions of a similar kind to a like degree."

Sec. 4503.37 R. C. reads:

"The attorney general, the director of highways, and the member of the public utilities commission who is designated by the commission for such purpose, may enter into any reciprocal contracts and agreements with the proper authorities of adjoining states as are proper and expedient, regulating the use, on the roads and highways of this state, of trucks, automobiles, and other motor vehicles owned in such adjoining states and licensed under the law thereof.

"Said state officials may also confer and advise with the proper officers and legislative bodies of this and other states, and the District of Columbia, for the purpose of promoting reciprocal agreements under which the registration of vehicles owned in this state, and the licenses of chauffeurs residing in this state, shall be recognized by such other states and federal districts."

The Attorney General, Director of Highways and a specially designated member of the Ohio Utilities Commission on the part of the State of Ohio and the Deputy Secretary of Revenue and Senior Counsel of the State of Pennsylvania entered into a Reciprocal Agreement relating to the use of streets and highways of Ohio of vehicles registered in Pennsylvania and bearing license plates from that state in the State of Ohio and vice-versa with respect to Ohio vehicles in the State of Pennsylvania on February 8, 1940.

Parts pertinent to this case provide as follows:

"The term 'Ohio Motor Carrier' as used in this agreement, shall be deemed to mean a natural person, resident of Ohio, or a firm, partnership, association or corporation organized or incorporated, or domesticated under the laws of Ohio, including their respective legal representatives in all cases, who or which is engaged in the business of transporting goods or passengers for hire by means of motor vehicles operated over the public streets and highways, including a motor transportation company or a private motor carrier as defined in the applicable provisions of the Ohio General Code, being such motor carrier as shall have its principal business headquarters within the State of Ohio; * * *"

"The term 'Pennsylvania Motor Carrier' as used in this agreement shall be deemed to mean a natural person, resident of Pennsylvania, or a firm, partnership, association or corporation organized or domesticated under the laws of Pennsylvania, including their respective legal repre-

sentatives in all cases, who or which is engaged in the business of transporting goods or passengers for hire by means of motor vehicles operating over the public streets and highways, being such motor carrier as shall have its principal business headquarters within the State of Pennsylvania; * * *"

"* * * no such Pennsylvania motor carrier shall be entitled to the benefits of this agreement with respect to operations in Ohio, except as it shall, where lawfully required, have and possess with respect to such operations any requisite permit or authority under Pennsylvania laws, and also a certificate of public convenience and equivalent authority under the Federal Motor Carrier Act of 1935, and also any requisite permit or authority from the Ohio Public Utilities Commission."

"In order to facilitate motor vehicle movements in interstate commerce between and through their combined geographical territories, the State of Ohio with respect to the interstate commerce operations of Pennsylvania Motor Carriers within Ohio territorial limits, and the State of Pennsylvania with respect to the interstate operations of Ohio Motor Carriers within the Pennsylvania territorial limits, agree that when such outstate carriers have secured reciprocity exemption cards or plates upon application as hereinafter mentioned, then they, the said States, shall to the extent of granted exemptions, severally waive and forego, and do hereby so waive and forego payment of their respective outstate motor carriers of the license plate taxes, * * *"

"The tax accrual period for and during which such taxes and fees may thus be waived shall commence with January 1, 1940, and shall continue until December 31, 1940, and thereafter until this compact and agreement shall be modified or altered between the contracting parties, or terminated by either on written notice first to be given to the other, of intent to terminate. * * *"

"And both states during the term of this agreement and subject to carrier's procurement of reciprocity exemption, will permit motor carriers of the other state, as qualified and included in the definition 'motor carrier' contained in Paragraph 1 hereof, to travel and operate in interstate commerce upon their several public streets and highways without necessity for the payment of the fees and taxes for which waiver provision is herein made. * * *"

"Neither state, however, shall be deemed to waive any of the foregoing taxes and fees insofar as the same may relate to intrastate operations within their respective territorial limits as conducted and performed by their said outstate carriers."

It is clear from the above that a license fee as regards this Company is waived by the State of Ohio, since it was organized under the Laws of Pennsylvania, has its principal business headquarters in that State and has the requisite permit and authority under Pennsylvania Laws to operate in Ohio as well as a Certificate of Public Convenience and equivalent authority under the Federal Motor Carrier Act of 1935, so long as it operates "in interstate commerce" upon the public streets and highways of Ohio. The State of Ohio, however, does not waive

such fee if the conduct and performance by this outstate carrier "relates to intrastate operations" within the State of Ohio.

The trial court obviously determined that the transaction leading to the arrest of the defendant was of the nature of intrastate commerce and as such required Ohio license plates on the tractor participating in accordance with the plain provision of the Reciprocal Agreement with respect to intrastate operations in Ohio of an outstate carrier. Was the court right in finding that Edward Szabo was engaged in intrastate commerce under the facts and circumstances of this case? If so, the defendant was guilty of the charge brought against him and the judgment against him must stand. If, however, he was engaged in interstate commerce at the time of his arrest, the conviction was erroneous and judgment will have to be reversed and the defendant discharged for the reason that under the reciprocal agreement, the license fee of the outstate vehicle is waived when operated in interstate commerce in Ohio.

It is stated in **9 O. Jur., 2d, 538, Sec. 33:**

"The term 'commerce' includes the transportation of persons and property by land and water, and it is well settled that interstate commerce includes the transportation of persons and commodities from one state to another.

"In the determination of whether a transportation of persons or property constitutes interstate or intrastate commerce, the essential character or unity of the movement is the decisive feature."

"* * *

"In order for local transportation to constitute interstate or foreign commerce, there must be such continuity of movement as to show that shipment to the ultimate destination was within the original contemplation of the shipper, and that stoppage or change of carriers is merely incidental to the shipment."

The commodity herein involved was shipped by the American Smelting and Refining Company of Baltimore, Maryland, to the Chase Brass and Copper Company, Cleveland, Ohio via the Baltimore and Pittsburgh Motor Express Company. The trailer on which the copper billets were loaded carried the load the entire route and reached the grounds of the consignee intact without transfer or change of any kind. The intention of the parties was that it be so transmitted and consequently the stoppage at the Cleveland Freight Terminal a mere procedural requirement that in no way interrupted the unity of the movement. It does not seem to us that the character and nature of the shipment from consignor to consignee was changed to any extent by the mere fact of the change of tractor and driver at the Cleveland Freight Terminal. In our opinion, it was a simple transaction transporting property from one state to another and constituted one movement throughout until delivery of the load to the plant of the Chase Brass and Copper Company at Euclid, Ohio, with the stoppage at the Cleveland Freight Terminal a mere incident to the general movement of the shipment from state to state. The trip from the terminal to the Chase Brass and Copper Company was part and parcel of that movement and as a result, an operation in interstate commerce.

In Swift and Company v. U. S., 196 U. S. 375, the Supreme Court of the United States had this to say:

"When cattle are sent for sale from a place in one state, with the expectation they will end their transit, after purchase, in another state, and when in effect they do so, with only the interruption necessary to find a purchaser at the stockyards, and when this is a constantly recurring course, it constitutes interstate commerce and the purchase of the cattle is an incident of such commerce."

and in Stafford et al v. Wallace, Secretary of Agriculture et al., 258 U. S. 495, the Supreme Court in paragraph four of the syllabus stated the following:

"4. Streams of commerce among the states are under the national protection and regulation, including subordinate activities and facilities which are essential to such movements though not of interstate character when viewed apart from them."

See **Albers, Admr. v. G. C. Transport Corp., 74 Oh Ap 425, paragraph one** of the syllabus; **Beam v. B. & O. Rd. Co., 77 Oh Ap 419, paragraph one** of the syllabus.

We hold, therefore, that the defendant-appellant, Edward Szabo, was operating a tractor-trailer in interstate commerce while driving from the Cleveland Freight Terminal of the Baltimore and Pittsburg Motor Express Company to the Chase Brass and Copper Company at its plant in Euclid, Ohio, and that he was not in violation of Section 9.3101 of the Traffic Code of the City of Cleveland.

The judgment of the Cleveland Municipal Court accordingly is reversed and we proceed to render the judgment which the trial court should have rendered and discharge the defendant. Exceptions. Order see journal.

SKEEL, J, HURD, J, concur.