(No. 11153.—Judgment affirmed.)

THE CHICAGO JUNCTION RAILWAY COMPANY, Plaintiff in Error, *vs.* THE INDUSTRIAL BOARD OF ILLINOIS *et al.* Defendants in Error.

*Opinion filed February 21, 1917—Rehearing denied April 6, 1917.*

1. RAILROADS—*rule as to a switching movement being part of inter-State commerce.* The rule that if the object of a switching movement is the placing of an empty car in a position to receive a load to be carried out of the State the car is regarded as being engaged in inter-State commerce from the time the switching movement is begun applies only where the movement is for the purpose of loading the particular car with an inter-State shipment.

2. SAME—*when switching movement is not a part of inter-State commerce.* Switching a string of refrigerator cars from the car shops to a storage track, where they are to be iced, is not a part of inter-State commerce transportation, where it is not known until after the cars have been iced and moved again from the storage track to the loading platform which of them will be used for inter-State and which for intra-State shipment; and in case a member of the first switching crew is injured the Workmen's Compensation act, and not the Federal Employers' Liability act, applies.

WRIT OF ERROR to the Circuit Court of Cook county; the Hon. OSCAR M. TORRISON, Judge, presiding.

WINSTON, PAYNE, STRAWN & SHAW, (JOHN D. BLACK, of counsel,) for plaintiff in error.

JAMES C. McSHANE, for defendants in error.

Mr. JUSTICE COOKE delivered the opinion of the court:

This is a writ of error to review a judgment of the circuit court of Cook county approving and confirming an award of compensation by the Industrial Board of Illinois. William S. Peterson, a switchman employed by the Chicago Junction Railway Company, plaintiff in error, sustained a fatal injury on October 9, 1913, in the course of his employment. It is conceded on both sides that if Peterson was engaged in inter-State commerce on behalf of his employer

at the time he was injured the judgment should be reversed, as in that case the Federal Employers' Liability act would govern, and if he was engaged in intra-State commerce at the time he received his injury the judgment should be affirmed.

Practically all the facts are stipulated and those concerning which testimony was given are not disputed.  From the stipulation and the undisputed facts it appears that Armour & Co. maintains and operates an extensive slaughtering and packing plant at the Union Stock Yards in Chicago and operates refrigerator cars in connection therewith.  The plaintiff in error is a common carrier and on the date of the accident was engaged in commerce between the several States as well as within the State of Illinois.  Armour & Co. maintained car shops in connection with its plant, and when its refrigerator cars were returned empty they were delivered to that company at its car shops and were there repaired, cleaned and iced for the next trip.  In order that cars would be sufficiently cooled to be loaded with meat it was customary during certain seasons of the year that they be iced from twenty-four to thirty-six hours before being loaded.  In Armour & Co.'s plant there are a number of yard or storage tracks, among them two known as tracks 22 and 23, which together hold between thirty and thirty-five cars.  Upon these two tracks cars are delivered from the car shops, a distance of about three-quarters of a mile.  Between tracks 22 and 23 is a track where the cars are re-iced while being switched, and to avoid delay and to insure that the cars would be sufficiently cooled it was customary for plaintiff in error and Armour & Co. to keep tracks 22 and 23 practically filled with cars that had been iced at the car shops and were ready to be re-iced and loaded with meat. The loading platform where the cars were loaded is about one-fourth of a mile distant from the two storage tracks 22 and 23.  A different switching crew moves the cars from the storage tracks to the loading platform than that which

277 — 33

.moves the cars from the car shops to the storage tracks. The deceased at the time of his injury was working as one of a switching crew which was engaged in moving fifteen cars from the car shops to the storage tracks. This train ran through a cross-over switch into another train on an adjoining track, and four of the cars were so disabled that they were not able to proceed with them. The eleven remaining cars were taken, after the accident, to the storage tracks, re-iced, and later in the day moved by another crew to the loading platform and were loaded, ten of them being loaded with meat to be shipped outside the State and one with meat to be shipped to a point inside the State. At the time these cars left the car shops there was no specific designation given·or intended as to where any particular car would ultimately go. The intention when the cars were sent for was that they were to be handled in the usual run of business at the loading platform, whether that involved, at the moment of their loading, intra-State or inter-State traffic. The number of cars shipped by Armour & Co. varies each day. It does not appear how many cars were shipped out on the day of this accident nor what proportion of them was shipped out of the State. The accident happened on Thursday, and the undisputed testimony shows that the average shipment on Thursday of each week is between fifty and sixty cars shipped outside the State and about thirty shipped to points within the State. A verbal order was first given by Armour & Co.'s representative to the conductor of the switching crew to bring fifteen cars from the car shops. He was not given the number of any car and did not know what the numbers of the cars were until he got them. As the cars were being pulled out of the shops he took down the numbers. A half hour later, as was the custom, this verbal order was confirmed by a written order, which contained the numbers of the cars as taken down by the conductor of the switching crew. Following the custom, these cars were moved first to the stor-

age track, re-iced, and moved with other cars to the loading platform and were there loaded with the material then ready for shipment, and it was not until each car was ready to be loaded that it could be determined whether it was to be engaged in an inter-State or intra-State shipment.

It is the contention of plaintiff in error that inasmuch as ten of these fifteen cars, when they reached the loading platform, were loaded with meat to be shipped outside the State, they were a part of an inter-State movement from the time they were taken out of the car shops by the switching crew, and that the deceased was therefore engaged in inter-State commerce at the time of his injury and was not entitled to compensation under the Illinois act. It has been held that if the object of a switching movement is the placing of an empty car in a position to receive a load to be carried out of the State the car is engaged in moving inter-State commerce from the moment the switching movement begins. (*Breske* v. *Minneapolis and St. Louis Railway Co.* 115 Minn. 386.) This is only where the switching movement is directed for the express purpose of loading the particular car with material to be shipped out of the State. In this case no particular one or more of the fifteen cars were designed to be used to carry an inter-State shipment at the time the conductor of the switching crew was ordered to move them to the storage track. It was not until these cars were again moved to the loading platform and it was known what material was ready to be loaded that it was determined that ten of them should be loaded for destinations outside the State and one to carry a shipment to a point within the State. The movement of the string of cars by the switching crew of which the deceased was a member was a local movement, and as none of these cars had at that time been selected to participate in an inter-State shipment the deceased was not engaged in inter-State commerce, and the circuit court properly approved and confirmed the award and decision of the Industrial Board. The icing of the cars

does not change the situation. The same procedure in icing was required in all the shipments made by Armour & Co. whether inter-State or intra-State, and was, in effect, a part of the equipment of the cars themselves.

The judgment of the circuit court is affirmed.

*Judgment affirmed.*