The action is under the Federal Employers' Liability Act to recover damages for negligence resulting in death.
Carey, an engineer in the service of defendant, was taking a string of coopered cars from the defendant's yard in Buffalo to another yard or junction. The cars were to be sent from the junction to the Buffalo grain elevators, where they were to be held in readiness for expected orders for the movement of grain. In switching the cars at the junction from the main track to a side one, Carey was killed. The question is whether he was engaged, when injured, in interstate commerce.
Buffalo is one of the great grain ports of the world. The grain that comes there through the Great Lakes is transferred into elevators until forwarded beyond. *Page 348 
The place in Buffalo where these elevators have been built is known as Burroughs Lot. How long the grain may be left there after it has been lifted from the vessel, the record does not show. Very often, perhaps generally, it is discharged from the elevator at once, to be carried in cars to the seaboard or to intermediate points. We take judicial notice of the fact that this is by no means the invariable practice. There are times when it is kept in storage at the elevators to be reconditioned for the owners or held for higher prices (cf. Shafer v. FarmersGrain Co., 268 U.S. 189, 192). The course of dealing in that regard will be traced at greater length hereafter. As to the place of origin of the grain, much, of course, will depend upon the location of the terminal. So far as the Buffalo elevators are concerned, the evidence is that all the grain there elevated, whether in transit or for storage, is brought from other States or countries. At active seasons, as in the fall movement of the crops, hundreds of cars leave the elevators in a day. In the slack season, as in June when Carey met his death, the cars are comparatively few. Movement begins in every instance at the Pennsylvania yard, which alone among the railroads has tracks contiguous to the terminals. When shipments are to be made to points on other lines, the Pennsylvania agent gives notice to the appropriate line to send the needed cars. Shipment is made at the elevators upon the cars of the line over whose route the grain is to be carried. This line collects the freight, and accounts to the Pennsylvania for the haul within the switching limits.
On June 9, 1927, at 3:45 P.M., the Pennsylvania agent at Burroughs Lot telephoned to the defendant for ten coopered cars. No orders had then been received for the shipment of grain over the defendant's line. The agent, instructed by experience, believed that orders would come in, and wished to have the cars at hand in order to avoid delay. They were surplus equipment in *Page 349 
anticipation of approaching needs. Of the ten cars dispatched by the defendant in response to this request, two were disabled when Carey was killed in a collision. The other eight arrived at Burroughs Lot on June 10, and were held awaiting orders. One other car belonging to the defendant was already on the spot. There is no occasion to enumerate the cars of other lines.
We have said that no orders had come in when the ten cars were requested of the defendant in anticipation of approaching needs. Some orders did come in, however, later in the day, one for a shipment from an elevator to Fairton, New Jersey, the other for a shipment to Batavia, New York. Since the cars were not collected till after 8 P.M., the inference is not unreasonable that before they left the yard, the two orders had been received by the agent at Burroughs Lot. The grain billed to Fairton, New Jersey, was placed the same day on the car already at the elevator. The grain destined for Batavia was placed on one of the eight cars arriving on June 10, two cars, it will be recalled, having been disabled on the way. The record does not tell us to whom this grain belonged, or how long it had been in storage before being loaded at the yard. After the shipment to Batavia, there remained seven of the defendant's cars, which moved at later dates. One, loaded on June 11, was billed to the Buffalo Flour Mills, at Buffalo, New York. The other six were loaded with grain belonging to B.F. Schwartz Co., and were billed on June 14, some to New York city, and some to Weehawken, New Jersey. Schwartz Company became the owners of this grain on June 9 while it was in transit on the Lakes, and gave orders for its reshipment on its delivery at the port.
The disposition of the cars has now been traced from the time of their arrival at the Pennsylvania yard. The question is still unanswered whether in their movement to that yard they were in interstate or local commerce. For this there is need that other data be before us. Contracts *Page 350 
for the carriage of grain over the waters of the Lakes describe the elevators at Buffalo as the point of destination. The grain is at rest, so far as the form of the documents discloses, when lifted from the vessel. Even so, the form is not conclusive if there has persisted an intention to move the grain forward in a transit substantially continuous, the halt at the elevators being merely "a convenient step in the process of getting it to its final destination" (Binderup v. Pathe Exchange, 263 U.S. 291,309; B. O.S.W.R.R. Co. v. Settle, 260 U.S. 166, 170, 173;Chicago Bd. of Trade v. Olsen, 262 U.S. 1, 33; Flanagan v.Federal Coal Co., 267 U.S. 222; Cott v. Erie R.R. Co.,231 N.Y. 67; cert. denied, 257 U.S. 636). The case for the plaintiff has been argued on the assumption that there is always that intention, or that exceptions are so extraordinary that they may be put aside as unimportant. But the difficulty is that the assumption is unsupported by the record. We are not informed by the evidence what proportion of the grain is received for transfer and what proportion held in storage. The burden is on the plaintiff to bring the case within the statute (Osborne v.Gray, 241 U.S. 16). If we turn, however, from the record and refer to public documents within the orbit of judicial notice, we see that there are other activities, such as reconditioning and storage, which are functions of these terminals, besides the furtherance of transit. Much information is to be gathered from volume III of a report of the Federal Trade Commission on the Grain Trade, and particularly on the subject of Terminal Grain Marketing (Publications U.S. Federal Trade Commission, December 21, 1921). The activities of terminal elevators are there classified as "private" and "public." Terminals classified as private operate elevators primarily for their own merchandising purposes, any warehousing done for others being secondary and incidental. Some of the terminals at Burroughs Lot are listed under the heading "private." Terminals *Page 351 
classified as "public" do business for the public generally. Both classes of elevators do other things besides transferring the grain, i.e., elevating and discharging it as an incident of transit. They recondition it and store it (see vol. III of said report, pp. 292, 293). The elevators at Buffalo, according to the report (pp. 117, 109, 147), are chiefly for reshipment, but this is not true even at Buffalo during the winter months (p. 109), and there is no suggestion that at any time the quantities held for reconditioning or for storage, either by private or by public elevators, are negligible exceptions. The diverse functions of transportation and storage appropriate to the terminals are reflected in the definitions by supervisory commissions (Report, p. 84). Transportation "elevation is defined as unloading grain from cars or grain-carrying vessels into a grain elevator and loading it out again after a period of not to exceed ten days; it does not include `treatment' or grading, cleaning, and clipping of grain; and retention in an elevator beyond ten days becomes storage and is not a part of the service of elevation as that word is used in the statute" (Allowances to Elevators byU.P.R.R. Co., 12 I.C.C. 85). The time allowance before storage differs at different ports (Report, p. 147; cf. Peter T. Dondlinger, The Book of Wheat, N.Y., Orange Judd Co., 1908, pp. 201-213), and the charge increases as the storage lengthens.
This analysis of the functions of terminal elevators at Buffalo and elsewhere destroys the basis for the statement that the ten coopered cars when on their way to Burroughs Lot had been allocated by the defendant to the service of interstate commerce. Their use was dependent upon needs unknown and unknowable. In saying this we assume that grain shipped over the Lakes to be reshipped at Buffalo is in interstate commerce while awaiting transfer at an elevator. We assume too that cars allocated to the carriage of grain in course of transfer are in interstate commerce during the preliminary movement from *Page 352 
the yard or the roundhouse to the elevating terminal (L. N.R.R. Co. v. Parker, 242 U.S. 13, 14; Penn. R.R. Co. v.Morrison, 3 Fed. Rep. [2d] 986; B. O.R. Co. v. Darling,3 Fed. Rep. [2d] 987). If all this be assumed, the plaintiff must still fail upon the record now before us. No one knew or could know when the request was made to send cars to the elevators in anticipation of approaching needs, whether the subject of the next shipment would be grain received at the terminals as part of a continuous transit, or grain held in storage and at length ordered to be released. If such an order had come before the arrival of the cars, the entire ten might have been used to carry grain that had been at rest for weeks or even months. Grain held for storage in the hope of higher prices is no longer grain in transit if the concept of transit is to be confined within any reasonable limits (Atlantic Coast Line R.R. Co. v. StandardOil Co. of Ky., 275 U.S. 257, 268; Atlantic Coast Line R.R.Co. v. Standard Oil Co. of N.J., 12 Fed. Rep. [2d] 541, cert. denied, 47 Sup. Ct. 102; Seaboard Air Line Ry. Co. v. Lee,14 Fed. Rep. [2d] 439; affd., 276 U.S. 591; Erie R.R. Co. v.U.S., 32 Fed. Rep. [2d] 613). This is so though the elevator companies are solely public warehousemen. It is even more plainly so where the grain in storage is their own. The quality of the movement from the terminals in response to future orders is thus incapable of prediction till the orders are received. The preparatory movement — the movement of empty cars as a supply for future needs — is not more certain than the movement for which it is preparing. Cott v. Erie R.R. Co. (supra), much relied upon by plaintiff, involved a very different situation. There the present fact was that a purpose "preconceived and pre-announced" (231 N.Y. at p. 71) had dedicated the cars that Cott was switching to the service of foreign commerce. We held that in such circumstances the remedy was not lost because the present fact was unknown to *Page 353 
the members of the switching crew. Here the only dedication was to the aid of commerce generally. The present fact controls in this case as in that. Carey, while engaged in the preliminary movement, was not in interstate or in local commerce as later exigencies might show that the cars would be utilized for the one purpose or the other (Grigsby v. Southern Ry. Co., 3 Fed. Rep. [2d] 988, 990; cert. denied, 268 U.S. 704; Illinois Cent.R.R. Co. v. Perry, 242 U.S. 292). He was in the one or in the other according to the instant need. Unless his service was so related to commerce between the States that he was acting in such commerce at the time of the collision, the remedy for his injuries is measured by the local law (Illinois Cent. R.R. Co.
v. Behrens, 233 U.S. 473; Chicago, B. Q.R.R. Co. v.Harrington, 241 U.S. 177, 180; Chicago Junct. Ry. Co. v.Indust. Bd. of Ill., 277 Ill. 512).
Cases such as Stafford v. Wallace (258 U.S. 495) andLemke v. Farmers Grain Co. (258 U.S. 50) are pressed upon us as sustaining the conclusion that the preliminary movement is subject to the Federal statute if, by reason of the general character of the business, there is a strong preponderance of probability that the later movement will be one in interstate commerce, even though the outcome may show it to be a movement in another field. The silence of the record as to the extent of deliveries for storage in comparison with those for transfer makes it impossible for us to say how strong the preponderance is, if indeed there is preponderance at all. But what was said in the cases cited has not modified the rule that an employee is within the protection of the Federal statute or without it according to the particular work that he is doing at the moment of the injury (Shanks v. D., L. W.R.R. Co., 239 U.S. 556). To switch coal cars to a bin where fuel will be conveniently at hand for any engine that may need it, is not a service within the statute, though interstate as well as local traffic will be helped by what is done (Chicago, B. Q.R.R. Co. v.Harrington, *Page 354 supra; cf. Lehigh V.R.R. Co. v. Barlow, 244 U.S. 183). To haul rolling stock to a yard where it can be used indiscriminately for one purpose or another is not commerce between the States, though it may be an indispensable act of preparation if commerce is to go on at all (Shanks v. D., L. W.R.R. Co., 239 U.S. 556; Erie R.R. Co. v. Welsh,242 U.S. 303). Acceptance of the plaintiff's argument would lead to the conclusion that if Carey had brought his cars to the terminals and had afterwards been injured while hauling them away, laden with grain that had been stored for weeks or months, the ancillary movement would have been within the act and the principal without it.
We have said that Stafford v. Wallace and Lemke v.Farmers Grain Co. (supra) have not modified the rule that the particular service, and not the general character of the business, is the test of interstate commerce in the application of the statute. The first (Stafford v. Wallace) had to do with the validity of an act of Congress, the Packers and Stockyards Act of 1921 (42 Stat. 159), providing for the supervision by Federal authorities of the business of the commission men and live stock dealers in the great stockyards of the country. The court held that so much of the business was interstate as to justify regulation of the business in its entirety, even though a good deal of it was intrastate or local. The rationale of the ruling was explained with great clarity by TAFT, Ch. J., writing for the court, in Atlantic Coast Line R.R.Co. v. Standard Oil Co. of Kentucky (supra, at p. 272). The second case, Lemke v. Farmers Grain Co., supra (followed inShafer v. Farmers Grain Co., supra), was concerned with the validity of an act of North Dakota, laying restrictions upon grain elevators doing business in that State. The court held that so much of the business was interstate — 90% interstate and 10% local (268 U.S. at p. 192) — as to make the effect of the restrictions an unreasonable burden on interstate transactions. *Page 355 
The constitutional power to pass a statute is one thing, and the construction of a statute when enacted is another. The question before us here is not the constitutional power of Congress to extend the application of the Employers' Liability Act to operations less direct and immediate in their relation to interstate or foreign commerce. The question here is the meaning of the statute which it has chosen to adopt. In adopting the Safety Appliance Act, it chose to give protection to travelers and employees upon the trains of interstate carriers, whether the transit at the moment of the injury was interstate or local (Ward v. Erie R.R. Co., 230 N.Y. 230, 232; cert. denied,256 U.S. 696; Texas Pac. Ry. Co. v. Rigsby, 241 U.S. 33). In adopting the Employers' Liability Act, it chose to limit the protection by the nature of the present service. Stafford v.Wallace and Lemke v. Farmers Grain Co. confirm what was said in Illinois Central R.R. Co. v. Behrens (supra, at p. 477) that it had power to go farther. It has not done so yet.
The judgment of the Appellate Division and that of the Trial Term should be reversed, and a new trial granted, with costs to abide the event.
POUND, CRANE, LEHMAN, KELLOGG and O'BRIEN, JJ., concur; HUBBS, J., not sitting.
Judgments reversed, etc.