Walter C. Young, Appellant, v. Chicago & Illinois
Midland Railway Company, Appellee.

Gen. No. 40,286.

Opinion filed March 28, 1939.   Rehearing denied April 20, 1939.

H. H. PATTERSON, of Chicago, for appellant; EDMUND C. MAURER, of Chicago, of counsel.

WALTER M. PROVINE and CLARK H. MILEY, both of Taylorville, for appellee; ISHAM, LINCOLN & BEALE and JAMES P. DILLIE, both of Chicago, of counsel.

MR. JUSTICE FRIEND delivered the opinion of the court.

Walter C. Young brought suit in the superior court under the Federal Employers' Liability Act against the Chicago & Illinois Midland Railway Company, to recover damages for injuries sustained by him while employed by and at work for defendant as a locomotive fireman. At the close of plaintiff's case the court directed a verdict for defendant, holding that as a matter of law plaintiff and defendant were not at the time of the accident engaged in interstate commerce or in work so closely related thereto as to be substantially a part thereof. Plaintiff appeals from the judgment entered on the verdict.

The sole question presented for review is whether the parties were engaged in interstate commerce at the time of the accident. The determination of this question requires a detailed review of the evidence adduced upon the hearing by plaintiff. The accident occurred January 30, 1937, at about 6:20 a. m. Plaintiff was an experienced locomotive fireman, and was then at work on engine 550, whose crew was engaged as a mine switcher. Its function was to fill the "empty hill," (a name designating the mine storage track for empty coal cars) at the mine with coal cars and gather up any other empty or loaded unbilled cars that the dis-

patcher wanted moved. His run took him from Taylorville to Humphrey, Illinois, and then back along the same route, and during the nine and one-half hours that this crew worked on the mine switcher, it traveled only a distance of about 20 miles. The accident occurred on the return trip. While proceeding from Humphrey, defendant's road passed through a place known as Bulpitt, then through the town of Kincaid, near to which is located mine No. 7 of the Peabody Coal Company, then about three miles farther on through the town of Calloway, where the coal company's mine No. 9 is located, then through Bando, about a mile beyond Calloway, and from Bando on to Taylorville, the end of the crew's run.

When the train upon which plaintiff was at work left Humphrey on the return journey to Taylorville, it consisted of about 65 cars and a caboose. As it reached Bulpitt, one Stilwell, the brakeman on another train known as extra 601, told plaintiff and his crew to "head in" on No. 1 passing track at mine No. 7 and leave the greater part of the cars in the train on that track. After leaving Bulpitt, and as the train passed Kincaid, defendant's operator there passed an order or message to plaintiff as to further work to be done by his crew. The train did not stop at Kincaid, the order having been passed to plaintiff by the operator through the use of a hoop or device employed in handling messages while a train is in motion. Plaintiff took the message into the cab of the engine, read and displayed it to the engineer and head brakeman, and then put it in his pocket. This occurred before the train reached the passing track at mine No. 7. The order thus transmitted to plaintiff read: "We want you at No. 9 not later than six thirty. Put your hoppers on the hill and take the no bills to Bando." After receiving this written order the train continued on to the passing track at mine No. 7, where the caboose was detached from the

rear of the train and left standing on the main line track, and all the cars except six empty hoppers next to the engine were placed on the passing track in obedience to the order received from Stilwell at Bulpitt. The engine and the six empty hoppers then pulled from the passing track out on to the main line, to proceed as directed in the written order handed up by the operator at Kincaid. The engineer told plaintiff that water had to be taken on the engine at the standpipe, located about eleven car lengths beyond this passing track, there being no other facilities for taking water between that place and Taylorville, the end of the run. Accordingly, the engine was backed up and plaintiff got on top of the tank at the rear of the tender and train, consisting of an engine and six cars, moved down to the water plug and stopped. Plaintiff removed the lid from the tank, pulled the spout down over it, and stood upon the spout in order to hold it in the opening and proceeded to take water. While in this position another crew, in charge of extra 601, brought the caboose that belonged on plaintiff's train down from where it had been left, and without any warning to plaintiff coupled it onto the rear of the hopper cars attached to plaintiff's engine with such force as to cause the engine and six cars to be moved forward some eight or ten feet. Plaintiff was knocked off the spout, which struck him in the chest and abdomen, and was severely injured. He was then assisted from the top of the tank into the cab of the engine, and did no more work in connection with that run.

At the time of the accident plaintiff and his crew were on their way to mine No. 9 at Calloway, in order to put the six empty hoppers "on the hill," and to "take the 'no bills' to Bando." Plaintiff testified that a no bill car is one "that our crew would not have the billing on." After the accident another fireman took plaintiff's place, and the crew put the hoppers "on the

hill'' and took the no bill cars to Bando. The record discloses that there were 15 of these no bill cars. They were loaded with coal, and the waybills show that seven of them were later billed from the Peabody Coal mine No. 9 at Calloway to Hammond, Indiana, and left Calloway on the morning of the accident. Seven of them were at the same time billed to a destination in Illinois and one car was unaccounted for.

It is conceded by defendant that these cars were not billed at the time they left Calloway, but the billing was made up at Taylorville on information received from the Peabody Coal Company. Plaintiff testified that in all the years that he worked for defendant at no time had they received billing at Calloway on any cars there picked up.

After plaintiff's crew left these 15 cars at Bando, at about 8:30 on the morning of the accident, some of defendant's other crews picked them up at Bando the same day, took them to Cimic, Illinois, and they were from there taken by the Illinois Central Railroad to Matteson, Illinois, and on to Hammond, Indiana. These 15 are the no billed cars that plaintiff and his crew were on their way to get at the time of the accident.

Evidence was introduced to show that December 29, 1936, Peabody Coal Company received an order from the Chicago District Electric Generating Corporation of Hammond, Indiana, for a monthly shipment of coal to it from mine No. 9 each day during the month of January, 1937, including the day plaintiff was injured. The traffic manager of Peabody Coal Company, who testified to this effect, also said that the billing for this coal was not made out at mine No. 9, but in the coal company's office at Taylorville, and that the coal company's manifest of billing showed that these cars of coal were billed from Calloway, Illinois, to Hammond, Indiana, January 30, 1937, and that seven of them were moved from Calloway to Hammond on that day. In

addition thereto 30 other cars were picked up by one of defendant's train crews during that day at some other place on defendant's road, for shipment to Hammond, Indiana, there having been 37 cars shipped to that same destination on that date. None of the 15 no bills handled by engine 550 and its crew that morning is claimed to have been interstate, excepting the seven which were, after the accident, afterward billed to Hammond, Indiana, at about 9:20 a. m. by the railroad company at the direction of the coal company. The evidence further discloses that these 15 cars were not picked up by any one crew, but were moved by two or more crews on the day in question. Substantially three hours intervened between the time of the accident and the actual billing of these cars.

It thus appears from the foregoing evidence that plaintiff and his crew received two orders prior to the accident. The first was transmitted to plaintiff at Bulpitt by Stilwell, of train No. 601, directing plaintiff's crew to put most of the cars in their train on passing track No. 1 at mine No. 7, located near Kincaid. The second order was received after leaving Bulpitt, and while passing through Kincaid, directing plaintiff and his crew to be at mine No. 9 no later than 6:30, put the empty hoppers on the hill and take the no bills to Bando. The first of these orders had been carried out by putting the cars on passing track No. 1 at mine No. 7, and the crew then proceeded to carry out the second order. It is argued that in order to do this it was necessary that the engine tank be filled with water, and that plaintiff at the time he was injured was taking water preparatory to putting the empty hoppers where they belonged, at mine No. 9, and also preparatory to taking the 15 loaded no bill cars on from mine No. 9 to Bando. The purpose in moving these no bill cars from mine No. 9 to Bando was "to take them down there for the other crew to pick up." The gravamen of plain-

tiff's contention is that seven of these cars were, the moment they left mine No. 9, on their way to Hammond, Indiana; that they in fact left mine No. 9 on their way to a destination in another State and defendant collected freight for the entire interstate journey from Calloway to Hammond; that in order to proceed with this interstate work, as counsel says, it was necessary to fill the engine with water, and that plaintiff, while doing this preparatory work, was engaged in furtherance of interstate transportation; and plaintiff argues that even though these cars were not billed until about 9:30 a. m., or three hours after the accident, that fact is immaterial under the well established rule of law governing cases of this kind.

Apparently the parties are entirely in accord as to the principles of law governing this cause; the controversy arises over the application to the facts of the well established principles enunciated in cases brought under the Federal Employer's Liability Act. The suit having been brought under the act, the burden was upon plaintiff to prove that he was engaged in interstate commerce at the time of the accident, or in work so closely related thereto as to be part thereof. (*Lavigne v. Chicago, M., St. P. & P. R. Co.*, 287 Ill. App. 253; *Osborne v. Gray*, 241 U. S. 16, 60 L. Ed. 865, 36 Sup. Ct. 486.)

Plaintiff cites and discusses numerous decisions dealing with facts not unlike the circumstances of this case, and without entering into a lengthy analysis of the rules invoked, as to which counsel are in substantial agreement, it may be said generally that the actual determined character of the movement controls, and mere form, in the nature of actual interstate billing at the time of the accident, is not essential, where the interstate purpose exists on the part of the shipper or railroad company at that time. The decisions upon which plaintiff relies support his contention that even in the

absence of actual billing at the time of the accident, the *intention* to move the shipment in interstate commerce is controlling, and that the predetermined character of the movement constitutes the essential element necessary to enable a party suing under the act to recover. The burden of proving the intention, however, rests upon the party suing, and in all the cases cited by plaintiff where recovery was allowed, the courts held that there was ample proof of the intention. The controversy between the parties in this proceeding arises over the question whether plaintiff adduced any evidence which, taken in its aspects most favorable to plaintiff, tended to show an intention on the part of the railroad company or shipper to forward these specific cars in interstate commerce.

Plaintiff relies to a large extent on the standing order for shipments of coal from mine No. 9 to Hammond, Indiana, and on the circumstance that 7 of these 15 cars were actually shipped to Hammond later on that date, although not billed until 3 hours after the accident. He fails to take into account however, that none of these 15 cars was shown to have been specifically designated for Hammond at the time he was injured, nor that on the same day some 30 other cars, in addition to 7 of the 15 cars in question, were picked up by one of defendant's trains at some other place on the railroad and were also billed and shipped to Hammond, Indiana.

It appears from the undisputed evidence that plaintiff and his crew did not know whether or not any of the unbilled cars were or would become interstate cars prior to or at the time of the accident. Plaintiff's counsel argues that this is immaterial, and defendant concedes that if they were actually interstate cars at the time of the accident, the mere fact that they were not billed and that plaintiff and the crew did not know whether they would be billed, is not the determining

factor. The salient question of fact is whether these particular seven cars had been *designated or intended* for interstate shipment when the accident occurred. If they were, the mere fact that plaintiff and his crew did not know this fact, and that the cars had not actually been billed at the time, would not preclude a recovery. The inquiry, therefore, arises as to whether plaintiff adduced any evidence tending to prove that these seven cars had been designated or intended for interstate shipment at the time of the accident.

It is conceded that none of the 15 cars was billed at the time of the accident, nor at the time the remaining members of plaintiff's crew moved them from No. 9 mine to Bando; also that plaintiff's crew never received any billing on these cars; that after the accident the crew of engine 550 moved them from mine No. 9 to Bando; and that about 9:20 that morning the coal company telephoned the billing instructions from the mine to defendant's office in Taylorville, where the actual billing was made out in the railroad office. From the waybills introduced in evidence it appears that 7 of these 15 cars were billed from Calloway to Hammond, Indiana, and on a rate that applied from Calloway, but the waybills do not show any actual movement of these cars to or from any place, nor do they indicate, as plaintiff argues, that they were part of an uninterrupted movement to another State. It cannot fairly be argued that the movement from mine No. 9 to Bando was made under these waybills, because the waybills were not made out at the time the cars were moved; nor do the waybills indicate that they were intended to cover the movement from Bando back to Calloway later on that date.

The evidence clearly discloses that the seven cars moved to Bando had not, at the time of the accident, been billed to any particular destination, other than the storage yard at Bando, and we are unable to find any

evidence in the record tending to show that they were designated or intended for interstate commerce prior to 9:20 a. m., when they were actually billed for Hammond, Indiana. Defendant's agent at Taylorville, who was called as a witness on behalf of plaintiff, testified that the railroad company had no information as to where the cars loaded at No. 9 mine would go until such time as it received the billing over the telephone; that Hammond became the destination of these seven cars at 9:20 a. m., when the railroad company received the billing instructions from the mine; and that Hammond was not their destination prior to the time they were billed. H. E. Ledford, conductor in charge of engine No. 550, testified that the track at Bando was a storage track, and that the only determination he had on the no bills was Bando; that he had no record beyond that and simply took the cars over there to store them and left them on the storage track with other no bills loads which were stored there.

We have searched the record diligently for evidence from which it could be fairly inferred that some designation or intention existed at the time of the accident to bill or ship any of the 15 cars in interstate commerce, but the record discloses no such intention or designation. So far as we can determine, no one knew what particular cars, or even how many of them, were to be taken from No. 9 mine to Bando, nor is there any evidence that any specific cars on the storage track at Bando were at the time intended for shipment to Hammond, Indiana.

A similar situation existed in *Foreman Trust & Savings Bank v. Grand Trunk Western Ry. Co.*, 242 Ill. App. 428, in which the court said (p. 436): "There is not a scintilla of evidence in the record showing that the movements of the car, first to the track and afterwards to the yards, were in connection with any interstate purpose. The plaintiff cannot establish her case by a guess. It may or may not have been that the

movement of the car to the track and afterwards to the yards for repair was only the interruption of a general interstate movement; but if such is the case, this record is wholly devoid of any testimony tending to show that material fact.''

In *Baldassarre v. Pennsylvania R. Co.*, 24 F. (2d) 201, the question arose as to whether particular cars had been designated for interstate commerce, and in discussing this question the court pointed out that at the time of the accident none of the cars had been weighed or billed, and said: ''It is possible that their foreign destination was fixed in the mind of the shipper from the moment they left the mill track; and it is possible that, if the destination was thus fixed, the interstate trip had been begun, though this test would leave the railroad, before billing, ignorant as to the character of its traffic. . . . At any rate, there is no evidence of any such prebilling fixation of character, and, if important at all, it was for plaintiff to show.''

In *Chicago Junction Ry. Co. v. Industrial Board*, 277 Ill. 512, plaintiff's intestate was killed while assisting in the movement of 15 empty cars from the shops to the storage tracks. At that time there was no specific destination given or intended as to where any particular car would ultimately go, and when the conductor received his order to make this movement he did not have the numbers of any cars and did not know what the numbers were until he took them down as they were being moved. Later that day 10 of these cars were loaded and shipped outside the State, and in discussing the question whether the parties were engaged in interstate commerce, the court said (p. 515):

''It is the contention of plaintiff in error that inasmuch as ten of these fifteen cars, when they reached the loading platform, were loaded with meat to be shipped outside the State, they were part of an inter-State movement from the time they were taken out of the car shops by the switching crew, and that the de-

ceased was therefore engaged in inter-State commerce at the time of his injury. . . . In this case no particular one or more of the fifteen cars were designed to be used to carry an inter-State shipment at the time the conductor of the switching crew was ordered to move them to the storage track. It was not until these cars were again moved to the loading platform . . . that it was determined that ten of them should be loaded for destinations outside the State and one to carry a shipment to a point within the State. The movement of the string of cars by the switching crew of which the deceased was a member was a local movement, and as none of these cars had at that time been selected to participate in an inter-State shipment the deceased was not engaged in inter-State commerce . . . ."

In *Shauberger v. Erie R. Co.*, 25 F. (2d) 297, it was said at p. 298, with reference to a car which was intended to have been an interstate car: "At the time of the accident it was not yet billed. It was later that day billed to Buffalo, N. Y.; but there is no proof that at this time its destination was definitely fixed by the shipper, much less known to the railroad. Clearly, the handling of this car at this time was not interstate commerce."

The foregoing cases and others cited in defendant's brief are uniformly in accord in holding that where the prebilling fixation of the character of the shipment is important, it is incumbent on plaintiff to prove this essential element; and although the foreign destination of the shipment may have been fixed in the mind of the shipper or railroad company, plaintiff cannot establish his case by conjecture, but must adduce evidence of the fact before he can recover. For all that appears in evidence the Peabody Coal Company could have designated other cars for shipment, to Hammond, Indiana. There were many other loaded cars on the storage track that day, and it would have been possible

for the coal company to have designated 37 other cars for Hammond, without including any of the 15 cars in question. It was not until the billing orders were subsequently made out that 7 of these cars were actually designated for the interstate journey, and until then no indication or designation of any particular car or cars existed so far as the record shows.

Since the material facts concerning plaintiff's employment are not in controversy, it became a question of law for the court to determine whether plaintiff and defendant were at the time of the accident engaged in interstate commerce, or work so closely related thereto as to be substantially a part thereof. The court was of the opinion that plaintiff's employment, as part of a crew on a mine switcher was of a purely local character, and after a careful examination of the evidence adduced by plaintiff, we concur in that conclusion. The judgment entered pursuant to a directed verdict should be affirmed and it is so ordered.

*Judgment affirmed.*

SCANLAN, P. J., and JOHN J. SULLIVAN, J., concur.