The PRODUCE PLACE, Petitioner,

v.

UNITED STATES DEPARTMENT
OF AGRICULTURE, et al.,
Respondents.

No. 95–1154.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 5, 1995.
Decided July 23, 1996.

Stephen P. McCarron, Washington, DC, argued the cause and filed the briefs, for petitioner.

Jeffrey A. Knishkowy, Attorney, United States Department of Agriculture, Washington, DC, argued the cause for respondents, with whom James M. Kelly, Associate General Counsel, was on the brief.

Before: GINSBURG, ROGERS and TATEL, Circuit Judges.

Opinion for the Court by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

The Produce Place, a wholesale dealer in fruits and vegetables, petitions for review of a Department of Agriculture order suspending for 90 days its license to do business. Having determined that the Petitioner's challenges to the legal and factual bases of this order lack merit, we deny the petition.

## I. Background

The Perishable Agricultural Commodities Act, codified as amended at 7 U.S.C. §§ 499a *et seq.*, provides that no person may carry on the business of a commission merchant, dealer, or broker (as defined in the Act) without a license issued by the United States Department of Agriculture. 7 U.S.C. § 499c. The PACA also proscribes certain "unfair conduct," and specifically makes it unlawful for a licensee

> to make, for a fraudulent purpose, any false or misleading statement in connection with any transaction involving any perishable agricultural commodity which is received in interstate or foreign commerce by such commission merchant, or bought or sold, or contracted to be bought, sold, or consigned, in such commerce by such dealer ...

7 U.S.C. § 499b(4). Violation of this provision may result in a 90–day license suspension. 7 U.S.C. § 499h(a).

The Produce Place is a wholesale produce dealer located in Los Angeles. A substantial portion of its business involves the interstate purchase and sale of fruits and vegetables. In October and November 1992 the Produce Place purchased six loads of berries from two California growers through the growers' sales agent, Sandy Jurach. These so-called "late-season berries" were weaker than berries harvested earlier in the season and thus were not suitable for shipment over a long distance.

Shortly after each load arrived, a USDA-authorized inspector noted the general condition of the fruit and measured and recorded its temperature on a certificate issued to the Produce Place. Knowing the temperature helps a buyer or seller determine whether produce has been handled properly since it left the seller's hands, an important fact because the seller usually warrants that the produce was in suitable condition when shipped. If the produce arrives in poor condition despite proper handling—including maintenance of the proper temperature—then the seller may be liable to the purchaser under the warranty.

After the berries arrived Ted Kaplan, an employee and one-third owner of the Produce Place, reported to Sandy Jurach that there were problems with their condition and asked for a price reduction. Jurach does not grant such price reductions without a federal inspection certificate documenting the condition in which the shipment was received. Kaplan altered the temperature recorded on the six USDA inspection certificates and faxed her copies of them. He claims that he did this because federal inspectors require that each shipment be removed from coolers for inspection, resulting in a temperature increase and a recorded temperature that does not accurately reflect the temperature at which the shipment was transported and stored. The inspection certificates indicated that each shipment had sustained bruising and decay, and Jurach did reduce the prices for the various shipments by as much as 75%, for a total reduction of $9,111.00. She authorized the price reductions based not upon the (altered) temperatures reported, but upon her knowledge that the berries were weak and upon the information on the certificates concerning the general condition of the shipments.

During an investigation inspired by an anonymous tip regarding irregularities in the records maintained by the Produce Place, a USDA investigator discovered the altered inspection certificates. The Fruit and Vegetable Division of the Agricultural Marketing Service (USDA) charged the Produce Place with "willful, flagrant and repeated violations" of 7 U.S.C. § 499b(4). After a two-day hearing, an Administrative Law Judge found that the Produce Place had committed the

alleged PACA infractions, and the departmental Judicial Officer eventually imposed a 90-day license suspension.

## II.  Analysis

The Produce Place raises three issues in its petition for review: (1) whether the transactions at issue occurred within "interstate commerce" as that term is used in the PACA, and thus whether the Secretary of Agriculture had jurisdiction over this case; (2) whether 7 U.S.C. § 499h(a)(2) provides the sole authority for administrative sanctions in this case, and thus whether the Secretary was empowered to act against the Produce Place even though it had not been convicted of the misdemeanor set out at 7 U.S.C. § 499n(b); and (3) whether substantial evidence in the record supports the ALJ's finding that Kaplan altered the inspection certificates with fraudulent intent.  We find no merit to the Petitioner's argument on any of these issues.

## A.  "Interstate Commerce"

■ The Produce Place argues first that the six transactions at the source of this case did not occur in "interstate commerce" as that phrase is used in the Act.  (The Petitioner does not argue that the transactions are beyond the constitutional reach of the Congress under the Commerce Clause of the United States Constitution, Art. I § 7.)  The PACA provides both its own definition of "interstate commerce," 7 U.S.C. § 499a(b)(3), and in § 499a(b)(8) a guide to its interpretation:

> A transaction in respect of any perishable agricultural commodity shall be considered in interstate or foreign commerce if such commodity is part of *that current of commerce usual in the trade* in that commodity whereby such commodity and/or the products of such commodity are sent from one State with the expectation that they will end their transit, after purchase, in another. . . .

The Produce Place argues that the raspberries and strawberries at issue here were deliberately reserved for intrastate commerce because their weak condition made them unsuitable for interstate shipping and that, therefore, they never entered "the current of [interstate] commerce."  According to the ALJ, however, the six shipments of strawberries and raspberries with which we are concerned did enter the current of interstate commerce because (1) strawberries and raspberries regularly move in interstate commerce, (2) the Produce Place regularly engages in interstate purchases and sales of produce, and (3) the Produce Place sold some of these strawberries and raspberries to a national hotel chain.  In these circumstances, the ALJ explained, the exclusion of the six shipments from the Secretary's jurisdiction would "greatly burden the administration of the Act."

We must reject the Petitioner's notion that the Congress intended to impose upon the Secretary the burden of proving that a particular shipment of produce was intended for interstate commerce in addition to showing that the shipment is of a type of produce that commonly moves in interstate commerce and was shipped for resale to or by a produce dealer that does a substantial portion of its business in interstate commerce.  The Produce Place does not dispute that this would significantly burden the administration of the Act and concedes that the Secretary's understanding of "current of commerce" is due deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).  Indeed, we have repeatedly held that an agency "can legitimately take into account its administrative burdens when defining an ambiguous term," *National Fuel Gas Supply Corp. v. FERC,* 900 F.2d 340, 345 (D.C.Cir. 1990) (citing cases), and the term "current of commerce" is nothing if not ambiguous.

As a textual matter, the Secretary has offered a reasonable interpretation.  In the spirit of the riverine metaphor used by the Congress, we read the Secretary implicitly to suggest that the current of interstate commerce should be thought of as akin to a great river that may be used for both interstate and intrastate shipping; imagine a little raft put into the Mississippi River at Hannibal, Mo., among the big barges bound for Memphis, New Orleans and ports beyond, with St. Louis as the rafter's modest destination.  On this view, a shipment of strawberries can enter the current of interstate commerce

even if the berries are reserved exclusively for sale and consumption within the state where they were grown. Or consider the perhaps more contemporary case of a truck that regularly uses an interstate highway to carry shipments of a commodity, one of which shipments is to an intrastate destination.

Contrary to the Petitioner's argument, nothing in *Stafford v. Wallace,* 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735 (1922), precludes the Secretary's interpretation. That case involved the constitutionality of the of the "current of commerce" provision in the Packers and Stockyards Act of 1921, 7 U.S.C. § 183. Relying upon *Swift & Co. v. United States,* 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905), an antitrust decision from which the Congress had in fact lifted the "current of commerce" metaphor, the Supreme Court held that even a transaction occurring wholly within an individual stockyard is in the current of interstate commerce: "The stockyards are but a throat through which the current flows, and the transactions which occur therein are only incident to this current from the West to the East and from one state to another." 258 U.S. at 516, 42 S.Ct. at 402. The Court did not, however, address the status of a particular stockyard transaction that facilitates only intrastate sales, the case that would be analogous to this one.

Nor can the Petitioner cite any prior disciplinary case in which the Secretary has adopted an interpretation of 7 U.S.C. § 499a(8) that is inconsistent with the interpretation he advances in this case. The Petitioner does cite *C.B. Foods, Inc.,* 43 Agric. Dec. 489 (1981), but it is not on point because the perishable commodities at issue there had traveled interstate before the intrastate sale that gave rise to that case.

We do not understand the Secretary to take the position that the Produce Place could not possibly have demonstrated—perhaps based upon the maintenance of rigid separation between its interstate and intrastate business—that some shipments of strawberries pass through its hands without entering the current of interstate commerce. His main concern appears to be whether the separation between the current of interstate commerce and a separate and distinct stream of intrastate commerce is sufficiently clear that recognizing the distinction would not unduly burden the administration of the Act. As noted, in this case the Produce Place has not even disputed the Secretary's conclusion that he would face a formidable administrative burden if the Petitioner were to prevail here.

## B. Administrative vs. Criminal Sanctions

In addition to authorizing the Secretary to suspend the license of a dealer who "make[s], for a fraudulent purpose, any false or misleading statement in connection with any transaction," 7 U.S.C. §§ 499h(a)(1) and 499b(4), the PACA authorizes the Secretary to suspend the license of a dealer convicted of a misdemeanor under 7 U.S.C. § 499n(b) ("Whoever shall falsely make, issue, alter, forge, or counterfeit ... any certificate of inspection ... shall be guilty of a misdemeanor"). 7 U.S.C. § 499h(a)(2). The Produce Place has not been convicted under § 499n(b), and the Secretary accordingly proceeded against the company under §§ 499h(a)(1) and 499b(4).

■ The Produce Place argues that because § 499n(b) sanctions the specific offense of "forg[ing] ... a certificate of inspection," by the principle that *expressio unius est exclusio alterius,* forgery cannot be thought also to come within the more general condemnation of "false [ ] statements" in § 499b(4). The Produce Place argues also that because § 499b(6) makes it unlawful to "alter ... any ... notice placed upon any container" the same principle precludes reading "false [ ] statement" in § 499b(4) to encompass the purposeful transmission of a fraudulently altered inspection certificate. The first line of reasoning leads to the peculiar conclusion that the Secretary, who has general authority to suspend a licensee for making a false statement must, in the case of a particularly egregious type of false statement, to wit, a forged inspection certificate, await a criminal conviction before he can suspend the miscreant. The second line of reasoning leads to the equally peculiar conclusion that prior to its enactment of the criminal sanction in § 499n(b), the Congress had provided the Secretary with no authority

to suspend a licensee who had fraudulently altered an inspection certificate and used it to facilitate a transaction.

In any event, the PACA authorized the Secretary to sanction a dealer for making a false statement long before the Congress added a criminal penalty for forging an inspection certificate. That the Congress found the threat of imprisonment necessary in order to deter that particular type of false statement in no way suggests that the Congress had not already empowered the Secretary to take administrative action against a forger under § 499b(4). Nor does anything in the legislative history provided by the Produce Place suggest that by adding a criminal provision the Congress intended to limit the Secretary's pre-existing administrative authority. Section 499h(a)(2), which authorizes the Secretary to suspend or revoke the license of any dealer convicted under the criminal provision (§ 499n(b)), is therefore better understood as a means merely of relieving the Secretary, when the inculpative facts have already been found beyond a reasonable doubt in another forum, of the procedural burden entailed in making a factual determination under § 499b(4), and not as creating the exclusive means of suspending the license of a forger.

Moreover, as the Secretary points out, the terms "remove, alter, or tamper with" in § 499b(6) do not reach the full extent of Kaplan's conduct in this case; he not only altered the inspection certificates, he submitted them to Jurach. While one might conclude from the specific terms of § 499b(6) that the Secretary cannot proceed under § 499b(4) against a licensee who has merely altered an inspection certificate without somehow using it in connection with any transaction—indeed, it is not clear that altering a certificate and then putting it in a file counts as a "mak[ing a] statement"—we have no occasion to reach that issue today. For now it is enough to conclude that neither of the Petitioner's *expressio unius* arguments is at all persuasive.

## C. Evidence of Fraudulent Intent

■ Finally, the Produce Place argues that the record does not contain substantial evidence indicating that Ted Kaplan altered the inspection certificates "for a fraudulent purpose." Kaplan admitted at the hearing, and the ALJ found, that Kaplan altered the certificates in case one of the Petitioner's customers, Ralph's Supermarkets, questioned whether the berries had been properly chilled. The ALJ also found that Kaplan had altered the certificates in order to support his request for a price adjustment from his supplier, Sandy Jurach.

The Produce Place does not dispute either finding but argues that they do not establish a fraudulent purpose. According to the Petitioner, Kaplan was merely trying to correct the information on the certificate in order to compensate for "what he perceived to be a flaw in the inspection process"—namely, that it required removing the berries from the cooler so far in advance of the actual inspection that their temperature would rise between three and seven degrees—rather than to mislead either Jurach or Ralph's as to the actual temperature at which the berries had been transported or stored.

Even if all this is true, it is wholly beside the point, which is that Kaplan knowingly misrepresented the temperature recorded by the inspector and intended that others would rely upon his misrepresentation. Kaplan's honest belief that the certificates did not reliably indicate the condition of the berries is not a license for him to change them. Those with whom the Produce Place deals may understand quite well the imperfections in the inspection process—Jurach testified that she did—and may adjust for those imperfections when considering the temperature recorded on an inspection certificate; then the unaltered information, even if uncertain, would be valuable within the trade. Indeed, that Kaplan altered the certificates in order to facilitate transactions with Ralph's and Jurach is ample evidence of his belief that the temperatures recorded on those certificates would matter to them. Whether they did in fact matter (and Jurach testified that they did not matter to her in this case) is not relevant to the validity of the ALJ's conclusion that Kaplan's purpose was fraudulent.

178

### III. Conclusion

For the foregoing reasons, the petition for review is

*Denied.*