David FISHGOLD, et al., Plaintiff,

v.

ONBANK & TRUST CO.,
et al., Defendants.

No. 96–CV–6572 L.

United States District Court,
W.D. New York.

March 25, 1999.

Michael J. Beyma, Underberg & Kessler, Rochester, NY, pro se.

Sanford R. Shapiro, Shapiro, Rosenbaum & Liebschutz, Rochester, NY, for David Fishgold, Inc.

David Fishgold, Inc., David Fishgold, Rochester, NY, pro se.

Francis B. Mahan, Rochester, NY, Joseph P. McCafferty, McCafferty & Williams, Cleveland, OH, for Key Produce Sales, Inc.

Hartley B. Martyn, Mark A. Amendola, Martyn & Associates, Cleveland, OH, James J. Rizzo, Rochester, NY, for Oswego Growers & Shippers, Inc., and Double Diamond Acres, Ltd.

Leonard Sarner, Sarner & Associates, Philadelphia, PA, Paul M. Lewis, New York City, for Giorgio Foods, Inc.

David L. Rasmussen, Harris, Beach & Wilcox, Rochester, NY, for Genecco Produce, Inc.

Stephen Michael O'Neill, Lacy, Katzen, Ryen & Mittleman, Rochester, NY, for Cayuga Produce, Inc.

Renee Y. Roy, Mansura, LA, for Harold Quebedeaux Produce, Inc.

G. Michael Grow, Villani & Grow, Williamson, NY, for Orbaker's Fruit Farm, Inc.

Stephen P. McCarron, McCarron & Associates, Washington, DC, Francis B. Mahan, Rochester, NY, for Weis–Buy Service, Inc. and Brock's Fresh Foods, Inc.

Jeffrey W. Baker, Harris, Beach & Wilcox, Rochester, NY, for OnBank & Trust Co.

Fred G. Aten, Jr., Rochester, NY, Greta Katrin Kolcon, Harter, Sectrest & Emery, Rochester, NY, Scott R. Teach, Meuers, Dressler & Kerr, LLP, Naples, FL, for Giumarra Vineyards Corp. and Lawrence H. Meuers.

## DECISION AND ORDER

LARIMER, Chief Judge.

### I. Background

By prior order of June 23, 1997, this Court directed that monies collected from accounts receivable of David Fishgold, Inc. ("Fishgold"), be held in trust for the benefit of Fishgold's suppliers under provisions of the Perishable Agricultural Commodities Act ("PACA").

Fishgold originally commenced this action when it sought to enjoin one of its creditors, OnBank & Trust Company ("OnBank"), from seizing its accounts receivable to satisfy its loan, now in default. Fishgold claimed that this seizure was in violation of PACA. Eventually, numerous PACA creditors intervened and filed claims to the trust's assets. A receiver was appointed to marshal the assets and to make payment to creditors with undisputed claims. The amount of money held in trust is unquestionably insufficient to satisfy the claims of all PACA suppliers, thus the trust will be distributed on a *pro rata*

basis to the eligible named PACA creditors.

The receiver sought to distribute $46,750 of the money held in the trust account, roughly 85% of the account balance. *Pro rata* distributions to five of the PACA creditors whose claims were undisputed were ordered by this Court on August 13, 1998:

| | |
|---|---|
| Key Produce Sales, Inc.: | $3,478.20 |
| Giumarra Vineyards, Corp.: | $4,726.43 |
| Cayuga Produce, Inc.: | $4,511.37 |
| Weis–Buy Service, Inc.: | $1,991.55 |
| Giorgio Foods, Inc.: | $9,999.83 |

Cayuga Produce, Inc. ("Cayuga") has filed objections as to the claims made by five of the remaining potential PACA creditors: Genecco Produce, Inc. ("Genecco"), Oswego Growers and Shippers, Inc. ("Oswego"), Brock's Fresh Foods, Inc. ("Brock"), Double Diamond Acres, Ltd. ("Double Diamond"), and OnBank.[1] Obviously, to the extent these objections are sustained, the trust corpus would increase, which would also result in an increased *pro rata* share to Cayuga and those other creditors whose claims to the funds are undisputed.

### II. Cayuga's Specific Objections

#### A. Objection to Genecco and Oswego's Claims—Were the Claimed Transactions in Interstate Commerce?

Cayuga asserts that two of the potential trust recipients, Genecco and Oswego,[2] should be disqualified because the claimed transactions were solely "intrastate," thus falling outside the provisions of PACA. Cayuga advocates a very narrow interpretation of the statute, limiting the provisions of PACA to commodities that have physically crossed state lines, or to situations where the parties specifically envisioned such a crossing. Although courts

---

1. Cayuga also objected to a claim filed by Lawrence W. Meuers. Although Meuers responded to these objections, he later withdrew his claim in correspondence provided to the Court via an attachment to Cayuga's Memorandum in Support of its objections.

(Dkt. # 92) Claims filed by Harold Quebedeaux Produce, Inc. and Orbaker's Fruit Farm were dismissed by order of the Court.

2. A similar "intrastate objection" was made against Brock and later withdrawn.

have employed differing methods of statutory analysis to define PACA's application to intrastate transactions, the policy behind these decisions remains consistent—PACA should not be interpreted in the rigid manner suggested by Cayuga.

The PACA statute, at 7 U.S.C. § 499e(c)(2), creates a trust for the benefit of sellers of "perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions...." The PACA trust provision is triggered when "in connection with any transaction in interstate or foreign commerce ... any commission merchant, dealer, or broker ... fail[s] ... to ... make full payment...." 7 U.S.C. § 499b(4). The term interstate commerce is defined as "commerce between any State or Territory, or the District of Columbia and any place outside thereof; or between points within the same State or Territory, or the District of Columbia but through any place outside thereof; or within the District of Columbia." 7 U.S.C. § 499a(3). A transaction under the Act is considered to be in interstate commerce if it "is part of that current of commerce usual in the trade in that commodity whereby such commodity and/or the products of such commodity are sent from one State with the expectation that they will end their transit, after purchase, in another...." 7 U.S.C. § 499a(8).

This language has been interpreted broadly, and covers the transactions conducted by Fishgold. *In re Southland + Keystone*, 132 B.R. 632, 640 (B.A.P. 9th Cir.1991) (The definition in this section "is essentially consistent with the broad definitions of interstate commerce developed by the Supreme Court.").

The D.C. Circuit poetically analyzed the Secretary of Agriculture's interpretation of the language in section 499a(8), noting that:

> In the spirit of the riverine metaphor used by the Congress ... the current of interstate commerce should be thought of as akin to a great river that may be used for both interstate and intrastate shipping; imagine a little raft put into the Mississippi River at Hannibal, Mo., among the big barges bound for Memphis, New Orleans and ports beyond, with St. Louis as the rafter's modest destination. On this view, a shipment of strawberries can enter the current of interstate commerce even if the berries are reserved exclusively for sale and consumption within the state where they were grown.

*Produce Place v. U.S. Dept. of Agriculture*, 91 F.3d 173, 175–76 (D.C.Cir.1996) (reviewing the revocation of petitioner's PACA license).

█ It is true that Genecco and Oswego have stated in their respective claims that their produce was shipped from within New York for distribution within New York. Yet it is also true that a portion of Fishgold's business involved produce that physically crossed state lines. Fishgold's complaint states that Fishgold purchased and imported perishable agricultural commodities in interstate commerce for distribution in New York. Complaint ¶ 5. This fact is corroborated by the unchallenged "interstate" claims of other PACA creditors in this action. Arguably, requiring the bifurcation of Fishgold's accounts into intra and interstate may, in and of itself, burden interstate commerce. *See J.R. Brooks & Son, Inc. v. Norman's Country Market, Inc.*, 98 B.R. 47, 50 (Bankr. N.D.Fla.1989) (Denying the trust provision to in-state suppliers would create an "additional burden" on interstate commerce.). Given the broad interpretation of interstate commerce under PACA, as well as the facts at hand, Cayuga's objections on this basis are hereby denied.

**B. Objection to Brock's Claim—Alleged Discrepancies in Invoices**

Cayuga challenges Brock's claims on two grounds. First, Cayuga argues that Brock has overstated the amount owing on an invoice submitted with its claim. Brock indicated a PACA trust claim for invoice

# 009511–00 in the amount of $3,542.25. This invoice is marked as "page 2." The actual entries on this page of the invoice, however, amount to only $884.50. Brock claims that page one of the invoice was "misplaced and inadvertently deleted." The Court accepts Brock's explanation, and concludes that this discrepancy is merely the result of a clerical or computer error. Cayuga's objection to this invoice is hereby denied.

■ Second, Cayuga objects to three invoices that indicate $150 in returned-check charges (# 009862–00, # 010490–00) and a $75 handling fee (# 009639–00). The language on the invoices submitted to the Court contain no mention of returned-check fees. The only reference to these fees are the actual entry items on the invoices submitted for reimbursement from the PACA trust. Those invoices contain no entries other than the returned-check charges. There has been no evidence submitted to the Court that the assessment of a returned-check fee was contracted for between the parties. As such, the Court will not consider those charges as "sums owing in connection with" the transaction under section 499e(c)(2), therefore, Brock cannot recover those fees from the PACA trust account. The $75 handling fee, however, was included on an invoice for the shipment of produce, and appears to be related to the produce charges noted on the bill. As such, this charge is recoverable from the PACA trust. *See Weis–Buy Services, Inc. v. Roncone,* 1997 WL 323523 (N.D.Ill. 1997).

## C. Objections to Double Diamond's Claim

### 1. Allegations that Double Diamond Did Not Give Proper Notice

■ Cayuga argues that Double Diamond did not give proper notice of its intent to preserve the PACA trust, alleging that there was "no allegation or proof offered that the requisite notice under 7 U.S.C. § 499e(c)(3) was given to the Secretary." Section 499e(c)(3) requires that notice be given to the "commission merchant, dealer, or broker within thirty calendar days (i) after expiration of the time prescribed by which payment must be made.... The written notice shall set forth information in sufficient detail to identify the transaction subject to the trust...." Under 499e(4), notice may also be printed on the invoices.[3]

Double Diamond's invoices did not contain PACA notice information. Instead, on July 10, 1996, Double Diamond sent a letter to Fishgold, stating "[t]his is a Notice Of Our Intent to preserve Trust Benefits. Attached are our invoices." The invoices were dated June 22, 1996; June 26, 1996; and June 28, 1996; and such notice was timely.

Moreover, it appears that Cayuga's objection is based on language deleted from PACA in 1995. Pre-amendment language in section 499e(c)(3) required that a PACA trust claimant "file[ ] such notice with the Secretary within thirty calendar days...." Reference to filing with the Secretary was removed on November 15, 1995. Pub.L. No. 104–48 § 6(a), 109 Stat. 424, 427 (1995). Cayuga's objection as to notice is hereby denied.

### 2. Double Diamond's Request for Interest

■ Double Diamond's invoices all contain language stating "2% per month carrying charges on all overdue accounts." Double Diamond asserts that this charge began accruing in August 1996 and continues to date. Double Diamond's proof of claim notes that $22,256.85 in carrying costs have accrued as of April 30, 1998.

---

**3.** 499e(4) provides in part:

In addition to the method of preserving the benefits of the trust specified in paragraph (3), a licensee may use ordinary and usual billing or invoice statements to provide notice of the licensee's intent to preserve the trust....

Some courts have held that interest charges, when part of the agreement between the parties, may be properly assessed in a PACA claim. *Morris Okun, Inc. v. Harry Zimmerman, Inc.,* 814 F.Supp. 346, 351 (S.D.N.Y.1993); *c.f. E. Armata, Inc. v. Platinum Funding Corp.,* 887 F.Supp. 590, 595 (S.D.N.Y.1995) (granting of prejudgment interest is within the court's discretion). As the carrying charge was noted on the invoices, such an agreement arguably existed. However; a court may decline to award interest when such an award would disadvantage other similarly situated PACA creditors. *See In re Richmond Produce Co.,* 112 B.R. 364, 376 (Bankr.N.D.Cal.1990) ("[A]llowance of such claims would only serve to modify the apportionment of the impounded funds in favor of some claimants as against others, when all of the claimants are similarly situated.").

■ Given the volume of claims pending before the Court and the relatively small amount of money available in the trust, the PACA claimants in this action are in a position to recover only a small *pro rata* percentage of their outstanding invoices. The application of a 2% carrying charge to Double Diamond's claim would severely disadvantage the remaining PACA claimants. The Court finds that a grant of 2% interest to Double Diamond would be inequitable. Thus, Double Diamond may not collect a 2% carrying charge from the PACA trust fund.

### D. OnBank's PACA Proof of Claim

■ OnBank also filed a PACA proof of claim, to which Cayuga objected. OnBank is clearly not, nor has it ever claimed to be, a supplier or seller of perishable agricultural commodities. As such, OnBank's claim is denied.

### III. Attorney's Fees

Both Key Produce and OnBank have filed separate requests for attorney's fees.

Both parties argue that their actions made it possible for others to recover PACA money. OnBank argues that if it had not taken steps to seize Fishgold's accounts receivable, there would be no fund from which the PACA creditors could collect. OnBank is seeking $13,190 in attorney's fees.[4] With the exception of one billing entry from August 6, 1996, OnBank's claim appears to include all legal services rendered to the bank from October 3, 1996 to February 25, 1997 in connection with the loan and Fishgold's defalcation. In contrast, Key Bank, seeking $2,898 in fees and $261.85 in costs, has limited its request to fees and charges incurred in seeking the appointment of a receiver and in including other potential PACA creditors in this action.

■ Attorney's fees may be recoverable under PACA when the parties have so contracted, or when ordinarily available as exceptions to the so-called "American Rule," which requires litigants to bear their own costs. *See Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *E. Armata, Inc.,* 887 F.Supp. at 594. The exceptions to the American Rule fall into three categories: 1) the "common fund exception," which allows for an award of attorney's fees where a party's "litigation efforts directly benefit others;" 2) the assessment of fees "as a sanction for the 'willful disobedience of a court order;'" and 3) the assessment of fees where a party has "'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Chambers v. NASCO, Inc.,* 501 U.S. 32, 45–46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (citations omitted).

### A. Key Produce's Request for Attorney's Fees.

■ Key Produce has not alleged any contractual basis by which it could seek attorney's fees. Instead, as Key Produce stresses in its submission to the Court,

***

**4.** This amount reflects a corrected tabulation of the claim.

Key Produce was involved in securing the common fund from which the intervenor-plaintiffs would share. Arguably, Key Produce is seeking attorney's fees for conduct which is analogous to that of a trustee. On May 5, 1997, Key Produce filed a Motion for Appointment of Receiver and Order for Mandatory Intervention of PACA Claimants. This motion was granted, and on June 23, 1997, the Court ordered Key Produce to provide notice to all potential PACA creditors of the need to intervene to preserve their rights. Although the Court ordered Fishgold to provide Key Produce with a list of potential PACA creditors, such a list was apparently not forthcoming. Key Produce states that it obtained a list of creditors only after filing a Freedom of Information Act request with the United States Department of Agriculture. Key Produce sent the requisite notice by certified mail, and pursuant to the Court's order, prepared and filed a PACA Trust Chart, indicating the amount of both the disputed and undisputed PACA claims.

Relying on the "common fund exception" to the American Rule, the Ninth Circuit in *In re Milton Poulos, Inc.* granted attorney's fees to a PACA creditor "directly responsible for the availability of the funds from the statutorily created trust." 947 F.2d 1351, 1353 (1991). The court noted that through the efforts of this creditor's attorneys, "the bankruptcy court declared the trust valid and enforceable, thereby permitting the funds to be dispersed among the trust claimants." *Id.; See In re Southland,* 132 B.R. at 643 (Allowing a bankruptcy trustee to offset collection costs where trust funds are ultimately turned over to PACA creditors.).

It should also be noted that much of the work for which Key Produce seeks compensation complemented the work performed by the trustee. It would be inequitable for the Court to compensate the trustee for his work in managing and distributing the fund (*see* Court's order of June 23, 1997), yet fail to award Key Pro-

duce reasonable attorney's fees and costs incurred in facilitating the trustee's work. Therefore, having found the attorney's fees and costs requested by Key Produce to be reasonable, Key Produce is awarded attorney's fees in the amount of $2,898 and costs in the amount of $261.85.

### B. OnBank's Request for Attorney's Fee

■ In support of its claim, OnBank cites no case law that suggests that a creditor ordered to disgorge collected accounts receivable for the benefit of PACA claimants can recover attorney's fees for its collection efforts. It is true that following Fishgold's default, OnBank's efforts to collect Fishgold's accounts receivable led to the accumulation of a sum of money that, pursuant to the Court's order, was later ordered held in trust, not for OnBank but for PACA claimants. OnBank's actions, many of which were adversarial to the interests of the PACA claimants and originally commenced to recover monies to satisfy its loan, do not warrant a fee award in OnBank's favor. Moreover, OnBank's submission to the Court does little to suggest any legal basis for such an award. OnBank's request for attorney's fees is hereby denied.

### CONCLUSION

Cayuga's objections to Genecco's (Dkt. # 73) and Oswego's (Dkt.# 75) claims are denied. Cayuga's objection to Brock's claims (Dkt.# 78) and Double Diamond's claims (Dkt.# 77) are granted in part and denied and part. Cayuga's objection to OnBank's proof of claim (Dkt.# 76) is granted. Key Produce's request for attorney's fees and costs (Dkt.# 90) is granted. OnBank's request for attorney's fees (Dkt. # 93) is denied. Pursuant to the September 1, 1998 letter from counsel for Lawrence H. Meurs, the proof of claim filed by Meuers (Dkt.# 69) is hereby dismissed with prejudice.

The trustee is ordered to make *pro rata* distributions to Genecco, Oswego, Brock,

and Double Diamond consistent with this opinion. The trustee is further ordered to distribute attorney's fees and costs to Key Produce in the amount of $3,159.85. The trustee is then ordered to submit a report to the Court indicating the remaining funds in the trust, and the *pro rata* distribution amounts to be made from the remaining funds to all of the eligible PACA creditors: Key Produce Sales, Inc.; Giumarra Vineyards, Corp.; Cayuga Produce, Inc.; Weis–Buy Service, Inc.; Giorgio Foods, Inc.; Genecco Produce, Inc.; Oswego Growers and Shippers, Inc.; Brock's Fresh Foods, Inc.; and Double Diamond Acres, Ltd.

IT IS SO ORDERED.